IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IRONSHORE SPECIALTY INSURANCE COMPANY, | ) | CIVIL ACTION NO. 3:18-cv-153 |
| | ) | |
| | ) | JUDGE KIM R. GIBSON |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| CONEMAUGH HEALTH SYSTEM, INC. | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JOHN O. CHAN, M.D., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

I.    **Introduction**

Before the Court is Defendants Conemaugh Health System, Inc.'s and John O. Chan, M.D.'s Motion to Dismiss Plaintiff's First Amended Complaint. (ECF No. 18.) This Motion is fully briefed (*see* ECF Nos. 19, 23, 29, 32) and is ripe for disposition. For the reasons that follow, the Court will **DENY** Defendants' Motion.

II.    **Jurisdiction**

This Court has jurisdiction over the action under 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000.

Venue is proper in the Western District of Pennsylvania under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this action occurred in the Western District of Pennsylvania.

## III. Background

The following facts, which the Court accepts as true for purposes of deciding this Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6), are alleged in Plaintiff's First Amended Complaint.[1] (ECF No. 12.)

This insurance-coverage dispute arises out of a professional liability insurance policy (the "Ironshore Policy") that Plaintiff Ironshore Specialty Insurance Company ("Ironshore") issued to Defendant Conemaugh Health System, Inc. ("Conemaugh") and one of its physicians, John O. Chan, M.D. (collectively the "Defendants"). (*Id.* ¶ 1.) Ironshore filed its Complaint in this case after a jury returned a verdict for $47,033,579—which the Court subsequently remitted to roughly $19,000,000—in another lawsuit against Defendants. (*Id.*)

### A. The Ironshore Insurance Policy

Conemaugh and Ironshore began negotiating an excess-insurance policy on or around November 12, 2013. (*Id.* ¶ 39.) Ironshore issued the Ironshore Policy to Conemaugh for the coverage period of January 2014 until September 2014. (*Id.* ¶ 10.) The Ironshore Policy covered up to 30 million dollars per claim in excess of coverage by Conemaugh's primary insurance coverage. (*Id.* ¶¶ 11-12.) While the Ironshore Policy was in effect, Conemaugh maintained three other insurance policies and additional protection under the Medical Care Availability and Reduction of Error Act ("Mcare").[2] (*Id.*) In sum, Conemaugh had total underlying

---

[1] Ironshore's First Amended Complaint (ECF No. 12) and a number of other documents, including filings related to the instant Motion to Dismiss, were filed under seal because they reference a settlement agreement involving a minor. (*See* ECF Nos. 16, 18, 19, 22, 23, 25, 26, 28, 29.)

[2] Specifically, while the Ironshore Policy was in effect, Conemaugh maintained: (1) ProSelect Primary HPL Policy No. 2-25167HPL with limits of $500,000 per claim and $2.5 million in the aggregate; (2) ProSelect Primary Practicioners (MD) Policy No. 2-25167MD under which Dr. Chan was a named insured, with limits of $500,000 per claim and $1.5 million in the aggregate; and (3) ProSelect First-Layer

insurance-coverage limits of 11 million dollars and an additional 1 million dollars of protection

through Mcare (collectively the "Underlying Coverage"). (*Id.*)

The Ironshore Policy does not provide coverage unless Conemaugh exhausted its

Underlying Coverage. (*Id.* ¶ 13.) The Ironshore Policy provided that:

> [Ironshore] shall pay on behalf of [Conemaugh] for loss, damages, settlements
> and defense expenses by reason of exhaustion of the limits of liability of the
> Underlying [Coverage] by the issuers of such Underlying [Coverage] . . . subject
> to (1) the terms and conditions of the Primary Policy . . . , (2) the Limit of Lability
> stated in ITEM 3 of the Declarations, and (3) the terms and conditions of, and all
> endorsements attached to, [the Ironshore] Policy.

(*Id.*)

The Ironshore Policy contained and incorporated other provisions that are relevant to

this action. First, the Ironshore Policy required Conemaugh to provide information that

Ironshore requests. The Ironshore Policy specifically provided that:

> [Ironshore] may, at its sole discretion, elect to associate in the investigation,
> settlement, or defense of any claim against [Conemaugh], even if the Underlying
> [Coverage] has not been exhausted. If [Ironshore] so elects, [Conemaugh] will
> cooperate with [Ironshore] and will make available all such information and
> records as [Ironshore] may reasonable require.

(*Id.* ¶ 14.)

Second, the Ironshore Policy incorporated a provision in one of the policies providing

Underlying Coverage which provided that Conemaugh must cooperate with its insurance

providers in the defense of claims and suits. (*Id.* ¶ 15.) Specifically, the Ironshore Policy

provides that:

---

Excess Policy No. 2-25167CA, with limits of $10 million per claim and in the aggregate. Additionally,
Conemaugh had access to underlying limits of $1 million through Mcare. (ECF No. 12 ¶ 11.)

[Conemaugh] must cooperate with [Ironshore] in the investigation and defense of CLAIMS and SUITS against [Conemaugh]. Upon [Ironshore's] request, [Conemaugh] must attend hearings, depositions, and trials and assist in securing and giving evidence, obtaining the attendance of witnesses and defending and effecting settlements. [Conemaugh] may not, except at [its] own cost, voluntarily make any payment, assume any obligation or incur any CLAIM EXPENSES. [Conemaugh] will do nothing before or after an INCIDENT to prejudice the defense of any CLAIM or SUIT insured under this POLICY. [Conemaugh] shall not enter into any oral or written contracts or agreements which in any way impair or waive [Ironshore's] right of defense.

(*Id.* at 76, Ex. B. § IX(2).)

Third, the Ironshore Policy allegedly incorporated or "followed the form" of a provision in Coverys ProSelect Insurance Company Policy Number 2-25167HPL (the "ProSelect Primary Policy") that excludes coverage for potential claims and incidents that Conemaugh knew of but failed to disclose on policy applications. (*Id.* ¶ 16; Ex. B § VI(10)(b)(iii).)[3] The Ironshore Policy defines "Application" as "any application furnished to [Ironshore], all other statements made and information furnished to [Ironshore] and to the issuer(s) of the Underlying Insurance, whether directly or through public filing." (*Id.* ¶ 17; Ex. A § III(A).) The ProSelect Primary Policy specifically excludes coverage:

[f]or, or in any way arising out of, or in any way involving in whole or in part any actual or alleged incident, circumstance, or situation . . . [t]hat was not disclosed to US in the POLICY APPLICATION or in any application submitted to US for prior acts or retroactive coverage and the INSURED or the NAMED INSURED knew or should have known that such INCIDENT, circumstance or situation had the potential to give rise to a CLAIM covered by this POLICY.

(*Id.* ¶ 16; Ex. B § VI(10)(b)(iii).)

_____

[3] This provision appears on page 69 of 189 of ECF No. 12.

## B.    The Underlying *Harker v. Chan* Lawsuit

On October 29, 2015, the law firm Kline & Specter filed a complaint on behalf of Ian Harker, Corradina Baldacchino, and G.H. (a minor) against defendants John O. Chan, M.D., Conemaugh Memorial Medical Center, Conemaugh Physician Group, Conemaugh Health System, Inc., and Duke LifePoint Healthcare in the Western District of Pennsylvania.[4]  (*Id.* ¶ 18.) The case ("*Harker v. Chan*") was assigned to Judge Kim R. Gibson.

### 1.    The Underlying Facts

*Harker v. Chan* arose out of Dr. Chan's treatment of a prematurely born baby—G.H.—at Conemaugh Memorial Medical Center in Johnstown, Pennsylvania. (*Id.* ¶ 19.) G.H. was born on December 27, 2012. (*Id.*) The plaintiffs alleged that Dr. Chan negligently wrapped the baby's head with a bandage to treat swelling. (*Id.*)    After the bandage was removed, there were abrasions on both sides of the baby's head and bruising on the baby's forehead. (*Id.* ¶ 20.) Approximately two weeks after the bandage was removed from the baby's head, the baby was transferred to Children's Hospital in Houston, Texas to be treated by plastic surgeons. (*Id.* ¶ 21.)

### 2.    Communications Between Conemaugh and Ironshore

On November 5, 2015, Conemaugh sent Ironshore a copy of the *Harker v. Chan* complaint. (*Id.* ¶ 22.)  Then, in 2017, at Ironshore's request, Conemaugh provided Ironshore with a list of "serious matters that Conemaugh was monitoring that might affect Ironshore's

---

[4] Ironshore's First Amended Complaint states that the matter was captioned No. 3:14-cv-277. However, the *Harker v. Chan* case was Civil No. 15-cv-277.

coverage." (*Id.* ¶ 23.) Conemaugh noted that expert reports in the case were unfavorable and that the case was "problematic in light of child with disfiguring marks on head." (*Id.* ¶¶ 23-24.)

In February 2018, Conemaugh sent Ironshore an updated report on the status of these cases. (*Id.* ¶ 25.) Conemaugh did not provide a trial date for *Harker v. Chan*, but did provide a copy of defense counsel's Case Status Report. (*Id.*) In that report, defense counsel estimated that a verdict ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*Id.*) Ironshore alleges that it was not provided with a subsequent report from defense counsel stating that the verdict could trigger Ironshore's excess coverage. (*Id.*) After receiving defense counsel's report, Ironshore appointed a claims representative to monitor *Harker v. Chan*. (*Id.* ¶ 26.) The claims representative asked Conemaugh to copy Ironshore on all significant correspondence. (*Id.* ¶ 26.)

On March 21, 2018, the day before the jury reached its verdict, a Conemaugh representative contacted Ironshore to inform it that the case was nearing the end of trial and that Conemaugh anticipated a negative verdict. (*Id.* ¶ 27.)

### 3. The Verdict

The trial in *Harker v. Chan* ended on March 22, 2018. That afternoon, the jury returned a verdict against Dr. Chan and Conemaugh—the two remaining defendants—for \$47,033,579. (*Id.* ¶ 29.) The jury's verdict was comprised of \$43,750,000 in noneconomic damages and \$3,283,579 for future medical expenses. (*Id.*)

Defense counsel filed a post-trial motion to challenge the jury verdict. On July 27, 2018, the Court remitted the jury award to approximately \$19,000,000.[5] (*Id.*)

---

[5] The Court remitted \$27,750,000 of the compensatory damage award, which resulted in a compensatory damage award of \$16,000,000 and overall verdict of \$19,283,579. While not incorporated in Ironshore's

### 4.    Settlement Negotiations

Ironshore alleges that Mcare made a settlement offer on March 16, 2018—the Friday before the trial began. (*Id.* ¶ 30.) Plaintiffs' counsel rejected that offer and stated that any settlement discussions would require participation from Conemaugh's excess insurance providers. (*Id.*) Despite that statement, Conemaugh did not inform Ironshore of the settlement discussions or asked to participate in settlement strategy. (*Id.*)

On March 22—the day the jury returned its verdict—Conemaugh's primary insurer and Mcare made a combined settlement offer of ████████.⁶ (*Id.* ¶¶ 31-32.) Plaintiffs' counsel rejected that offer. (*Id.*) Conemaugh did not inform Ironshore the March 22 settlement discussions. (*Id.* ¶¶ 32-34.)

On August 15, 2018, after the Court's decision on remittitur, the insurers and plaintiffs agreed to resolve the *Harker v. Chan* matter for a total of ████████. (*Id.* ¶ 41.) Under that agreement, Conemaugh's primary insurer paid ████████, Mcare paid ████████, and Ironshore paid the remaining ████████. (*Id.*) Ironshore alleges that its contribution towards the settlement agreement was "subject to its continued reservation of rights, including its right to recoup." (*Id.* ¶ 42.)

---

Complaint, the Court's opinion on defendants' Motion for Post-Trial Relief is available at: *Harker v. Chan*, No 3:15-cv-277, 2018 WL 3599734 (W.D. Pa. July 27, 2018) (Gibson, J.).

⁶ Ironshore alleges that Conemaugh's insurers made this settlement offer on March 21. (ECF No. 12 ¶ 31.) However, Ironshore also alleges that this settlement offer was made on the same day that the jury returned its verdict. (*Id.* ¶ 32.) Elsewhere in the Complaint, Ironshore correctly states that the jury returned its verdict on March 22. (*Id.* ¶ 29.) Accordingly, while immaterial to the Court's decision on the instant Motion, it appears that this settlement offer was made on March 22, 2018.

## C. Procedural History

On August 1, 2018, soon after this Court remitted the jury verdict in *Harker v. Chan*, Ironshore filed a complaint against Conemaugh and Dr. John O. Chan. (*See* ECF No. 1.) Ironshore then filed its First Amended Complaint on September 19, 2018. (*See* ECF No. 12.)

Ironshore's First Amended Complaint includes three counts: (1) a declaratory judgment for breach of the "Cooperation Clause" in the Ironshore Policy that requires Conemaugh to make requested information available to Ironshore (*id.* ¶¶ 43-50); (2) a declaratory judgment for breach of the "Known Claims and Circumstances Clause" in the ProSelect Primary Policy which required Conemaugh to disclose all claims that it knew of on its insurance applications (*id.* ¶¶ 51-58); and (3) unjust enrichment because Ironshore indemnified Conemaugh when no indemnity was owed (*id.* ¶¶ 59-62).

Defendants Conemaugh and Dr. Chan filed the instant Motion to Dismiss on October 15, 2018. (*See* ECF No. 18.) Ironshore responded on November 14, 2018. (*See* ECF No. 23.) Defendants subsequently filed a reply brief (*see* ECF No. 29) and Ironshore filed a sur-reply (*see* ECF No. 32). Accordingly, the instant Motion became ripe for disposition on December 17, 2018.

## IV. Standard of Review

A complaint may be dismissed under Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016). But detailed pleading is not generally required. *Id.* The Rules demand only "a short and plain statement of the claim showing that the pleader is entitled to

relief" to give the defendant fair notice of what the claim is and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting Fed. R. Civ. P. 8(a)(2)).

Under the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps.[7] First, the court must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009). Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679; *see also Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011) ("Mere restatements of the elements of a claim are not entitled to the assumption of truth.") (citation omitted). Finally, "[w]hen there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Connelly*, 809 F.3d at 786. Ultimately, the plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## V.  Discussion

### A.  The Court Will Not Dismiss Count I Because Ironshore Plausibly Alleges that Conemaugh Breached the Ironshore Policy's "Cooperation Clause"

The "Cooperation Clause" of the Ironshore Policy provides that Ironshore "may, at its sole discretion, elect to associate in the investigation, settlement, or defense of any claim against

---

[7] Although *Iqbal* described the process as a "two-pronged approach," *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009), the Supreme Court noted the elements of the pertinent claim before proceeding with that approach, *id.* at 675–79. Thus, the Third Circuit has described the process as a three-step approach. *See Connelly*, 809 F.3d at 787; *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 n.4 (3d Cir. 2011) (citing *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (2010)).

the Insured, even if the Underlying Insurance has not been exhausted. If [Ironshore] so elects, the Insured will cooperate with [Ironshore] and will make available all such information and records as [Ironshore] may reasonably require." (ECF No. 12 ¶ 45.)

As a preliminary matter, the Court finds that the Cooperation Clause is unambiguous. Under Pennsylvania law, courts interpret unambiguous writings as a matter of law, while ambiguous writings are interpreted by the finder of fact. *First Guard Ins. Co. v. Bloom Servs., Inc.*, No. 3:15-59, 2018 WL 949224, at *4 (W.D. Pa. Feb. 6, 2018) (Gibson, J.); *Kripp v. Kripp*, 849 A.2d 1159, 1163-64 (Pa. 2004). When the language of an insurance policy is clear and unambiguous, courts must give effect to the policy's language. *See Westport Ins. Corp. v. Hippo Fleming & Pertile Law Offices*, No. 3:15-cv-251, 2018 WL 4705780, at *12 (W.D. Pa. Oct. 1, 2018) (Gibson, J.) (citing *401 Fourth St., Inc. v. Inv'rs Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005)).

Ironshore alleges that Conemaugh breached the Cooperation Clause by failing to notify Ironshore that *Harker v. Chan* was scheduled for trial, despite Ironshore's repeated requests for information. (*Id.* ¶ 47.)

Ironshore also alleges that it requested additional information on the *Harker v. Chan* matter several times. First, Ironshore alleges that on June 14, 2017, Ironshore requested information on "serious matters that Conemaugh was monitoring that might affect Ironshore's coverage." (*Id.* ¶ 23.) In response to that inquiry, Conemaugh reported that the expert reviews in the *Harker* case were unfavorable and "problematic in light of child with disfiguring marks on head." (*Id.* ¶ 24.)

Then, on February 2, 2018, Ironshore requested updates on the serious matters that Conemaugh reported to Ironshore in June of 2017. (*Id.* ¶ 25.) Conemaugh responded with an

-10-

updated list of cases. (*Id.*) The list contained trial dates for some cases, but not *Harker v. Chan.* (*Id.*) Conemaugh's response only included a case-status report from its defense counsel in *Harker v. Chan.* (*Id.*) However, while this report noted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ it did not note that trial was scheduled to begin in March 2018—the following month. (*Id.*)

On February 13, 2018, Ironshore informed Conemaugh that an Ironshore claim professional would be assigned to the *Harker v. Chan* case. (*Id.* ¶ 26.) The claim professional requested that Conemaugh's counsel copy Ironshore on "significant correspondence." (*Id.*)

Ironshore alleges facts that establish a plausible claim for breach of the Ironshore Policy's Cooperation Clause. Ironshore alleges that it requested information on *Harker v. Chan* at least four times. From the allegations in Ironshore's First Amended Complaint, it is plausible that Conemaugh did not provide Ironshore with "all . . . information and records as [Ironshore] may *reasonably* require"—thereby violating the Cooperation Clause.

Ironshore clearly alleges that it elected to participate in the *Harker v. Chan* defense. The Court must infer that Ironshore triggered the Cooperation Clause when it requested information on serious matters that might implicate the Ironshore Policy in June of 2017, and again in February of 2018. But even if these requests for information did not constitute an "elect[ion] to associate in the investigation, settlement, or defense of any claim," Ironshore clearly elected to "associate" in *Harker v. Chan* when it appointed a claim professional to the case and requested to be copied on all significant correspondence. Therefore, Ironshore plausibly alleges that Conemaugh had a duty to "make available all such information and records as [Ironshore] may reasonably require" as of February 2018.

-11-

Defendants argue that Ironshore never elected to affirmatively participate in *Harker v. Chan*. (ECF No. 19 at 9, 12-13.) They also argue that Conemaugh provided Ironshore with ample notice of the *Harker v. Chan* action and that it complied with Ironshore's requests for additional information on the matter. (*Id.* at 10.) Specifically, Defendants argue that the Ironshore Policy did not require Conemaugh to provide Ironshore with any particular information—including a trial date or the status of settlement negotiations. (*Id.* at 9-10.)

The Court finds that it would have been reasonable for Conemaugh to provide Ironshore with trial dates for *Harker v. Chan*. When Conemaugh supplemented its list of serious matters in February of 2018, it included trial dates for other cases. (*See id.* ¶ 25.) This shows that Conemaugh was aware that trial dates were the type of information that Ironshore reasonably required to assess its potential exposure.

Moreover, Ironshore plausibly alleges that Conemaugh breached the Ironshore Policy's Cooperation Clause by failing to notify Ironshore of pre-verdict settlement discussions. Ironshore alleges that the parties engaged in settlement discussions on March 16, 2018—the Friday before trial began. (*Id.* ¶ 30.) Ironshore alleges that Conemaugh failed to notify it of this significant correspondence between Conemaugh's counsel and plaintiffs' counsel. (*Id.*) Conemaugh's failure to notify Ironshore of these pretrial settlement discussions appears especially unreasonable given that plaintiffs' counsel noted that any settlement would require participation from the Conemaugh's excess-insurance carriers. (*Id.*)

Similarly, plaintiffs' counsel made a non-negotiable settlement offer of ▮▮▮▮▮▮ on March 21, 2018—the day before the jury returned its verdict. (*Id.* ¶¶ 31-33.) On that same day, a Conemaugh representative contacted Ironshore to notify it that the trial was nearing

-12-

completion and that Conemaugh was expecting a "negative verdict." (*Id.* ¶ 27.) But the Conemaugh representative did not mention that plaintiffs' counsel made a settlement offer that implicated Conemaugh's excess insurance. (*Id.*) The Court finds that the March 21 settlement offer was significant correspondence, and therefore that Conemaugh failed to copy Ironshore or provide Ironshore with information that Ironshore reasonably required to participate in the settlement discussions.

Accordingly, the Court will not dismiss Count I of Ironshore's First Amended Complaint because Ironshore plausibly alleges that Conemaugh breached the Ironshore Policy's Cooperation Clause.

## B. The Court Will Not Dismiss Count II Because Ironshore Plausibly Alleges that Conemaugh Breached the "Known Claims and Circumstances Clause"

Ironshore alleges that Conemaugh breached the "Known Claims and Circumstances Clause" by failing to disclose the *Harker v. Chan* action on its applications for the ProSelect Primary Policy and Ironshore Policy. (*Id.* ¶¶ 51-58.) The Known Claims and Circumstances clause of the ProSelect Primary Policy—which was issued for coverage from January 1, 2014 until January 1, 2015—excludes coverage:

> [f]or, or in any way arising out of, or in any way involving in whole or in part any actual or alleged incident, circumstance, or situation . . . [t]hat was not disclosed to US in the POLICY APPLICATION or in any application submitted to US for prior acts or retroactive coverage and the INSURED or the NAMED INSURED knew or should have known that such INCIDENT, circumstance or situation had the potential to give rise to a CLAIM covered by this POLICY.

(*Id.* ¶ 16; Ex. B § VI(10)(b)(iii).)

Ironshore alleges that the Ironshore Policy "follows form" of the ProSelect Primary Policy. (*Id.* ¶¶ 15-16.) Ironshore alleges that the ProSelect Primary Policy's Known Claims and

-13-

Circumstances clause required Conemaugh to disclose the incident giving rise to *Harker v. Chan* on its application for the Ironshore Policy because "it was likely to give rise to a claim under the Ironshore Policy." (*Id.* ¶¶ 54-55.)

Ironshore also alleges that "[c]overage is excluded for the *Harker* Action under the Ironshore Policy's Known Claims and Circumstances Exclusion." (ECF No. 12 ¶ 56.) While it is unclear which provision Ironshore's First Amended Complaint refers to, the Ironshore Policy contains a "Notice" provision that provides that:

> [a]s a condition precedent to any right to payment of the Insured under this Policy, the Insured shall give the Underwriter written notice of . . . any claim under the Underlying Insurance as soon as possible, but in no event later than required for report of claims under the Primary Policy; provided, that the Insured shall give the Underwriter notice of any claim involving professional liability coverage as soon as practicable, but in no event later than ninety (90) days after the expiration of the Policy Period; and . . . any matter, including a Notice of Circumstance, with respect to which notice has been provided under any Underlying Insurance; provided, that the Insured shall give the Underwriter notice of any Notice of Circumstance involving professional liability coverage as soon as practicable, but in no event later than the expiration of the Policy Period. As used herein, the term "Notice of Circumstance" means written notice of specific facts or circumstances of which the Insured becomes aware during the Policy Period that may subsequently give rise to a claim.

(*Id.*, Ex. A at 7.)[8]

As a preliminary matter, the Court finds that the ProSelect Primary Policy's Known Circumstances and Claims provision and the Ironshore Policy's Notice provision are unambiguous. Under Pennsylvania law, courts interpret unambiguous writings as a matter of law, while ambiguous writings are interpreted by the finder of fact. *First Guard*, 2018 WL 949224, at *4; *Kripp*, 849 A.2d at 1163-64. When the language of an insurance policy is clear and

---

[8] This provision appears on page 22 of 189 of ECF No. 12.

unambiguous, courts must give effect to the policy's language. *See Westport Ins. Corp.*, 2018 WL 4705780, at *12 (citing *401 Fourth St., Inc.*, 879 A.2d at 171).

Defendants argue that Count II should be dismissed for several reasons. First, Defendants assert "it is factually implausible that Ironshore required a description of the medical event preceding the *Harker* Action." (ECF No. 19 at 14.) Defendants argue that the Known Claims and Circumstances Provision of the ProSelect Primary Policy did not apply to Conemaugh's application for the Ironshore Policy because "Ironshore does not allege that it was in contractual privity with Coverys, nor does it allege that it was a third-party beneficiary of the contractual relationship between the primary carrier and Conemaugh." (*Id.* at 15.) Second, Defendants argue that Conemaugh was not required to disclose the *Harker v. Chan* on its application because it could not have known that Dr. Chan's treatment of G.H. might lead to a claim against it. (*Id.* at 16-17.) And third, Defendants argue that the Notice provision of the Ironshore Policy excuses its nondisclosure of the facts underlying *Harker v. Chan* on its application for the Ironshore Policy. (*Id.* at 16.) The Court will address these arguments in turn.

First, Ironshore plausibly alleges that all the terms of the ProSelect Primary Policy are incorporated into the Ironshore Policy. The Ironshore Policy contains "Follow Form Excess Policy Declarations" that list Conemaugh's policies for Underlying Coverage. (ECF No. 12, Ex. A at 2-4.)[9] The "Follow Form Excess Policy" applies "in conformance with the terms, conditions, limitations, exclusions, definitions, and endorsements of the Primary Policy." (*Id.* at 5.) Courts applying Pennsylvania law hold that an excess insurance policy incorporates the terms and provisions of an underlying policy where the excess policy "follows form" of an

---

[9] This provision appears on pages 18-21 of 189 of ECF No. 12.

underlying policy. *See, e.g., Gen. Refractories Co. v. First State Ins. Co.*, 234 F.R.D. 99, 101 (E.D. Pa. 2005) (citing *Gould, Inc. v. Arkwright Mut. Ins. Co.*, No. 3-cv-92-403, 1995 WL 807071, at *2 (M.D. Pa. Nov. 7, 1995)); *Gen. Accident Ins. Co. of Am. v. Safety Nat. Cas. Co.*, 825 F. Supp. 705, 708 (E.D. Pa. 1993) (concluding that "excess liability policy incorporates *all* of the terms and conditions of the . . . primary liability insurance policy" where the excess policy states "that it incorporates all the terms and conditions of the primary policy(ies) listed"). Therefore, the Court finds that the ProSelect Primary Policy's Known Claims and Circumstances provision plausibly applies to Conemaugh's application for the Ironshore Policy. Ironshore plausibly alleges that Conemaugh was required to disclose *Harker v. Chan* when it applied for the Ironshore Policy, but failed to do so. While potentially relevant, the fact that Ironshore was not in privity with Coverys or a third-party beneficiary of the ProSelect Primary Policy does not defeat Ironshore's claim as a matter of law.

Second, Ironshore plausibly alleges that Conemaugh should have known that Dr. Chan's treatment of G.H. could lead to a claim against Conemaugh when it applied for the Ironshore Policy. Dr. Chan treated G.H. in late 2012 and early 2013. (ECF No. 12 ¶ 54.) Conemaugh applied for the Ironshore Policy in late 2013. (*Id.* ¶¶ 39, 54.) Therefore, given this timing, it is plausible that Conemaugh knew that Dr. Chan's treatment of G.H. could bring about a potential claim when Conemaugh applied for the Ironshore Policy. Moreover, given the nature of Dr. Chan's treatment of G.H., it is plausible that Conemaugh knew or should have known that G.H.'s injuries would give rise to a claim. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(*Id.* ¶ 21.) Accordingly, the Court finds that Ironshore plausibly alleges that Conemaugh knew or should have known that Dr. Chan's treatment of G.H. might result in a claim against it.

Third, the Court finds that the Ironshore Policy's Notice provision does not alleviate Conemaugh's duty to disclose potential claims on its application for the Ironshore Policy. As pleaded, Count II involves Conemaugh's failure to disclose the potential for a claim resulting from Dr. Chan's treatment of G.H. on the application before the inception of the Ironshore Policy. (*Id.* ¶¶ 51-58.) The Ironshore Policy's Notice provision, on the other hand, relates to claims that arise after the policy's inception. And Ironshore's First Amended Complaint does not appear to allege a violation of the Ironshore Policy's Notice provision. Therefore, the Ironshore Policy's Notice provision does not affect the plausibility of Count II.

In sum, the Court will not dismiss Count II of Ironshore's First Amended Complaint because Ironshore plausibly pleads that the Known Claims and Circumstances provision of the ProSelect Primary Policy is incorporated into the Ironshore Policy. Therefore, Conemaugh had a duty to report "any incident, situation, or circumstance that had the potential to give rise to a claim" when applying for the Ironshore Policy. Ironshore plausibly pleads that Conemaugh should have know that Dr. Chan's treatment of G.H. might result in a claim against Conemaugh, but failed to disclose it on its application for the Ironshore Policy. Accordingly, the Court will not dismiss Count II.

## C. The Court Will Not Dismiss Count III Because Ironshore Plausibly Alleges that Conemaugh was Unjustly Enriched

In Count III of its First Amended Complaint, Ironshore alleges that it is entitled to restitution for the indemnity expenses that it paid on Defendants' behalf to settle the *Harker v.*

-17-

*Chan* case. (ECF No. 12 ¶¶ 59-62.) Ironshore notes that it indemnified Conemaugh in *Harker v. Chan* subject to its right to seek recoupment. (*Id.* ¶ 61.) Ironshore alleges that "[b]ecause no indemnity was owed, [Conemaugh has] received an unbargained-for benefit at the expense of Ironshore and [that] Ironshore is entitled to recover in an amount up and including all indemnity expenses paid on its behalf." (*Id.* ¶ 62.)

Under Pennsylvania law, unjust enrichment is an equitable doctrine that requires the defendant to pay to the plaintiff the value of the benefit conferred. *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super. 1999) (citing *Schenck v. K.E. David, Ltd.*, 666 A.2d 327 (Pa. Super. 1995)). To prove unjust enrichment, the plaintiff must show:

> (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. The application of the doctrine depends on the particular factual circumstances of the case at issue. In determining if the doctrine applies, our focus is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched.

*Id.* (citing *Torchia v. Torchia*, 499 A.2d 581, 582 (Pa. Super. 1985)).

Defendants argue that Count III must be dismissed because the express terms of the Ironshore Policy do not allow Ironshore to seek reimbursement for payment on a covered claim. (ECF No. 19 at 17.) Defendants argue that "[r]eimbursing the insurer under such a theory of unjust enrichment would amount to an impermissible, unilateral modification of the written contract and is prohibited under Pennsylvania law." (*Id.*)

Defendants rely on two opinions—one from the Third Circuit and one from Pennsylvania courts—to support its argument that "an excess insurer has no right to recoupment against the insured under a theory of unjust enrichment where such a duty is not

expressly stated in the policy." (*Id.* at 18 (citing *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.,* 2 A.3d 526 (Pa. 2010); *Axis Specialty Ins. Co. v. Brickman Grp. Ltd., LLC,* 458 F. App'x 220, 224 (3d Cir. 2012)).)

Ironshore cites two other opinions—one from the Third Circuit and one from the Eastern District of Pennsylvania—to support its argument that an insurer may recoup indemnity payments from the insured where the incident was not covered by the policy. (ECF No. 23 at 17 (citing *Essex Ins. Co. v. RMJC, Inc.,* 306 F. App'x 749 (3d Cir. 2009); *Am. W. Home Ins. Co. v. Donnelly Distrib., Inc.,* No. 14-cv-797, 2015 WL 505407 (E.D. Pa. Feb. 6, 2015)).)

First, Defendants rely on *Jerry's Sport.* There, the Superior Court of Pennsylvania held that "insurers cannot receive reimbursement [of defense costs] absent an express provision allowing so in the written insurance contract." 948 A.2d 834, 845 (Pa. Super. 2008). The Superior Court held that allowing reimbursement of defense costs after the insurance company issued a reservation-of-rights letter would amount to an impermissible unilateral contract modification. *Id.* The Supreme Court of Pennsylvania affirmed the Superior Court's decision. *See* 2 A.3d 526 (Pa. 2010). The Court notes that *Jerry's Sport* deals with the insured's right to a defense, which is distinct from its right to indemnity. *See, e.g., Nat'l Specialty Ins. Co. v. Advanced Cargo Transp., Inc.,* No. 3:14-cv-1417, 2015 WL 4557387, at *4 (M.D. Pa. July 28, 2015). Therefore, the applicability of *Jerry's Sport* in this case is questionable.

In *Axis v. Brickman,* the other case that Defendants rely upon, the insurer paid $250,000 towards a settlement and later demanded recoupment of that payment. 458 F. App'x at 223. In that case, the Third Circuit affirmed the district court's holding that the insurer was not entitled to recoupment of settlement payments because the policy did not expressly allow for

recoupment. *Id.* at 224. However, *Axis v. Brickman* is distinguishable from this case because the insurer there did not issue a reservation-of-rights letter. And in that case, the insured did not bring a claim for unjust enrichment.

However, the district court in *Axis* generally acknowledged that "an insurer who makes a settlement payment on its insured's behalf may assert an unjust enrichment claim for reimbursement if it is determined that the insurer was not obligated to make the payment under the terms of the insurance policy."[10] 756 F. Supp. 2d 644, 655 (E.D. Pa. 2010).

Ironshore relies primarily upon two other cases—*Essex* and *Donnelly.* In *Essex*, the Third Circuit noted that Pennsylvania courts have not determined whether an insurer's voluntary payment of a settlement precludes recovery of indemnity payments. 306 F. App'x at 754. There, the Third Circuit held that the insurer was entitled to recoupment of its settlement payments because there was no duty to indemnify the insured under the policy. *Id.* at 755. In other words, the insurer was entitled to recoupment because the settlement was not covered under the policy. *Id.* Similarly, in *Donnelly*, the Eastern District of Pennsylvania followed *Essex* and held that an insurer was entitled to recoup settlement costs on an unjust-enrichment theory

---

[10] The district court in *Axis v. Brickman* also distinguished *Jerry's Sport* and *Essex* to formulate a four-part test for unjust-enrichment claims in the reimbursement context:

> in order to prevail on an unjust enrichment claim for reimbursement, the insurer must establish that (1) it did not make the payment due to a mistake of law; (2) the insured was on notice at the time of the payment that the insurer disputed its obligation to pay; (3) it did not make the payment primarily to protect its own interest; and (4) permitting reimbursement under the circumstances presented would not upset the delicate incentive structure inherent in the insurer/insured relationship.

756 F. Supp. 2d at 652-56. The Court finds this test to be instructive. However, this test has not been expressly adopted by the Third Circuit. Thus, the Court will not consider this test to determine whether Ironshore's unjust-enrichment claim is specifically pled.

because the insurer had no duty to indemnify the insured under the policy. 2015 WL 505407, at
*5.

These opinions do not clearly establish whether an excess insurer may recoup indemnity
payments under Pennsylvania law. Given this uncertainty, this case law does not defeat
Ironshore's unjust-enrichment claim as a matter of law.

Here, Ironshore plausibly alleges that it conferred a benefit on Defendants by paying
indemnity on Conemaugh and Dr. Chan's behalf to settle *Harker v. Chan*. (ECF No. 12 ¶ 60.)
Ironshore alleges that it reserved its right to seek recoupment at a later date. (*Id.* ¶ 61.)
Ironshore further alleges that Defendants accepted that benefit and therefore that Defendants
were unjustly enriched. (*Id.* ¶¶ 61-62.) Therefore, Ironshore's First Amended Complaint
facially states an unjust-enrichment claim.

Moreover, given the Court's decision on Counts I and II, Ironshore plausibly alleges that
Defendants were not entitled to coverage in *Harker v. Chan* under the Ironshore Policy.
Accordingly, the Court finds that Ironshore pleads a plausible unjust-enrichment claim, and
therefore will not dismiss Count III of Ironshore's First Amended Complaint.

**VI.    Conclusion**

In conclusion, for the preceding reasons, the Court finds that Ironshore has pled
plausible claims against Defendants in its First Amended Complaint. Accordingly, Defendants'
Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 18) is **DENIED**.

A corresponding order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IRONSHORE SPECIALTY INSURANCE COMPANY, | ) ) | CIVIL ACTION NO. 3:18-cv-153 |
| | ) | JUDGE KIM R. GIBSON |
| **Plaintiff,** | ) | |
| v. | ) ) | |
| CONEMAUGH HEALTH SYSTEM, INC. | ) ) | |
| and | ) ) | |
| JOHN O. CHAN, M.D., | ) ) | |
| | ) ) | |
| **Defendants.** | ) | |

### ORDER

AND NOW, this $\underline{28^{th}}$ day of February, 2019, upon consideration of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint (ECF No. 18), IT IS HEREBY ORDERED that the Motion is DENIED. The Clerk of Court is directed to seal the attached memorandum opinion.

BY THE COURT:

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE