IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IRONSHORE SPECIALTY INSURANCE    )        CIVIL ACTION NO. 3:18-cv-153
COMPANY,                          )
                                  )        JUDGE KIM R. GIBSON
    Plaintiff and Counterclaim     )
    Defendant,                     )
                                  )
    v.                             )
                                  )
CONEMAUGH HEALTH SYSTEM,          )
INC.,                             )
                                  )
    Defendant / Counterclaim       )
    Plaintiff/ Third Party         )
    Plaintiff,                     )
                                  )
and JOHN O. CHAN, M.D.,           )
                                  )
    Defendant,                     )
                                  )
    v.                             )
                                  )
PROSELECT INSURANCE COMPANY,      )
                                  )
    Third Party Defendant.         )

## MEMORANDUM OPINION AND ORDER

### I.    Introduction

This is an insurance dispute arising out of a medical malpractice case[1] against Conemaugh Health System, Inc. and John O. Chan, M.D. (collectively "Conemaugh"). Pending before the Court is Defendant Conemaugh's Motion for Summary Judgment against Plaintiff Ironshore Speciality Insurance Company ("Ironshore"). (ECF No. 174). Also pending before the

---

[1] That case is *Harker v. Chan*, No. 3:15-cv-277 (W.D. Pa. filed Oct. 29, 2015).

Court is Counterclaim Defendant Ironshore's Motion for Partial Summary Judgment against Counterclaim Plaintiff Conemaugh. (ECF No. 173).

Additionally, pending before the Court is Third-Party Defendant ProSelect Insurance Company's ("ProSelect" or "Coverys")[2] Motion for Summary Judgment against Third-Party Plaintiff Conemaugh. (ECF No. 171).  Also pending before the Court is Third-Party Plaintiff Conemaugh's Motion for Summary Judgment against Third-Party Defendant ProSelect. (ECF No. 172).

The Motions are fully briefed (*see* ECF Nos. 176, 183, 190, 194, 217, 221, 225, 242, 243, 247, 248, 251, 255-1, 259) and ripe for disposition.

For the reasons that follow, Conemaugh's Motion for Summary Judgment Against Ironshore (ECF No. 174) is **DENIED**. Ironshore's Motion for Partial Summary Judgment Against Conemaugh (ECF No. 173) is **GRANTED**. ProSelect's Motion for Summary Judgment Against Conemaugh (ECF No. 171) is **GRANTED**. Conemaugh's Motion for Summary Judgment Against ProSelect (ECF No. 172) is **DENIED**.

## II.     Jurisdiction and Venue

The Court has jurisdiction over this action because the parties are diverse and the amount in controversy exceeds $75,000.  28 U.S.C. §§ 1332, 1367 and FED. R. CIV. P. 14.

Venue is proper in the Western District of Pennsylvania because a substantial part of the events giving rise to this action occurred in the Western District of Pennsylvania.  28 U.S.C. § 1391.

---

[2] ProSelect, the named Third-Party Defendant, does business as Coverys. (ECF No. 183 at 2, fn. 1). Both ProSelect and Coverys will be used interchangeably throughout this Memorandum Opinion.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IRONSHORE SPECIALTY INSURANCE COMPANY, )
)
)
Plaintiff and Counterclaim )
Defendant, )
)
v. )
)
CONEMAUGH HEALTH SYSTEM, )
INC., )
)
Defendant / Counterclaim )
Plaintiff/ Third Party )
Plaintiff, )
)
and JOHN O. CHAN, M.D., )
)
Defendant, )
)
v. )
)
PROSELECT INSURANCE COMPANY, )
)
Third Party Defendant. )

CIVIL ACTION NO. 3:18-cv-153

JUDGE KIM R. GIBSON

## MEMORANDUM OPINION AND ORDER

### I.    Introduction

This is an insurance dispute arising out of a medical malpractice case[1] against Conemaugh Health System, Inc. and John O. Chan, M.D. (collectively "Conemaugh"). Pending before the Court is Defendant Conemaugh's Motion for Summary Judgment against Plaintiff Ironshore Speciality Insurance Company ("Ironshore"). (ECF No. 174). Also pending before the

---

[1] That case is *Harker v. Chan*, No. 3:15-cv-277 (W.D. Pa. filed Oct. 29, 2015).

Court is Counterclaim Defendant Ironshore's Motion for Partial Summary Judgment against Counterclaim Plaintiff Conemaugh. (ECF No. 173).

Additionally, pending before the Court is Third-Party Defendant ProSelect Insurance Company's ("ProSelect" or "Coverys")[2] Motion for Summary Judgment against Third-Party Plaintiff Conemaugh. (ECF No. 171). Also pending before the Court is Third-Party Plaintiff Conemaugh's Motion for Summary Judgment against Third-Party Defendant ProSelect. (ECF No. 172).

The Motions are fully briefed (*see* ECF Nos. 176, 183, 190, 194, 217, 221, 225, 242, 243, 247, 248, 251, 255-1, 259) and ripe for disposition.

For the reasons that follow, Conemaugh's Motion for Summary Judgment Against Ironshore (ECF No. 174) is **DENIED**. Ironshore's Motion for Partial Summary Judgment Against Conemaugh (ECF No. 173) is **GRANTED**. ProSelect's Motion for Summary Judgment Against Conemaugh (ECF No. 171) is **GRANTED**. Conemaugh's Motion for Summary Judgment Against ProSelect (ECF No. 172) is **DENIED**.

## II.    Jurisdiction and Venue

The Court has jurisdiction over this action because the parties are diverse and the amount in controversy exceeds $75,000. 28 U.S.C. §§ 1332, 1367 and FED. R. CIV. P. 14.

Venue is proper in the Western District of Pennsylvania because a substantial part of the events giving rise to this action occurred in the Western District of Pennsylvania. 28 U.S.C. § 1391.

---

[2] ProSelect, the named Third-Party Defendant, does business as Coverys. (ECF No. 183 at 2, fn. 1). Both ProSelect and Coverys will be used interchangeably throughout this Memorandum Opinion.

III.     **Factual Background**

The following facts are undisputed unless otherwise noted.[3]

The factual background and procedural posture of this case are complex and extensive. The Court recounts the factual and procedural record in significant depth in order to provide necessary background. Ironshore filed its Complaint[4] in this case after a jury returned a verdict of $47,033,579—which this Court subsequently remitted to $19,283,579—in another lawsuit against Conemaugh.

a.     **Conemaugh's Insurance Policies with ProSelect and Ironshore**

At the times relevant to this lawsuit, Conemaugh purchased the following insurance policies from ProSelect: (1) ProSelect Primary HPL, Policy No. 2-25167HPL, with limits of $500,000 per claim and $2,500,000 in the aggregate; (2) ProSelect Primary Practitioners (MD), Policy No. 2-25167MD, with limits of $500,000 per claim and $1,500,000 in the aggregate; and (3) ProSelect First-Layer Excess Policy, 2-25167CA, with limits of $10,000,000 per claim and in the

---

[3] The Court derives these facts from a combination of the Court's July 27, 2018, Memorandum Opinion and Order (*Harker*, ECF No. 96), Conemaugh's Local Rule 56(b)(1) Concise Statement of Undisputed Material Facts (ECF No. 195) and the exhibits referenced therein, Ironshore's Local Rule 56(b)(1) Concise Statement of Undisputed Material Facts (ECF No. 177) and the exhibits referenced therein, ProSelect's Local Rule 56(b)(1) Concise Statement of Undisputed Facts (ECF No. 184) and the exhibits referenced therein, Conemaugh's Local Rule 56(b)(1) Concise Statement of Undisputed Material Facts (ECF No. 191) and the exhibits referenced therein, Ironshore's Local Rule 56(c) Response to Conemaugh's Concise Statement of Undisputed Material Facts (ECF No. 218) and the exhibits referenced therein, Conemaugh's Local Rule 56(c) Response to Counterclaim Ironshore's Concise Statement of Undisputed Material Facts (ECF No. 222) and the exhibits referenced therein, Conemaugh's Local Rule 56(c) Response to ProSelect's Concise Statement of Undisputed Facts (ECF No. 226) and the exhibits referenced therein, ProSelect's Local Rule 56(c) Response to Conemaugh's Concise Statement of Undisputed Material Facts (ECF No. 216) and the exhibits referenced therein, ProSelect's Local Rule 56(d) Response to Conemaugh's New Matter to ProSelect's Statement of Undisputed Facts (ECF No. 244) and the exhibits referenced therein, and Ironshore's Local Rule 56(d) Response to the "New Matter" in Conemaugh's Response to Ironshore's Concise Statement of Undisputed Material Facts (ECF No. 250) and the exhibits referenced therein.

[4] Ironshore filed an initial Complaint at ECF No. 2 and subsequently filed a First Amended Complaint at ECF No. 12.

aggregate (collectively, the "Primary Policy"[5]).   (ECF No. 196 at Exhibits 1, 2, and 3). The Primary Policy provided a total coverage limit of $11,000,000. (*Id.*).

The Primary Policy was effective for claims made against Conemaugh between January 1, 2014, and January 1, 2015.[6] (*Id.*).  Conemaugh had an additional $1,000,000 in coverage under the Medical Care Availability and Reduction of Error Act ("MCARE" or "the Act"), for a total underlying coverage amount of $12,000,000 (the "Underlying Coverage Amount"). (ECF No. 195 at ¶ 4).  In addition to the Primary Policy and MCARE, Conemaugh purchased a follow-form excess insurance policy from Ironshore (the "Ironshore Policy") that covered claims exceeding the Underlying Coverage Amount.  (ECF Nos. 195 at ¶ 5; 218 at ¶ 5). The Ironshore Policy was effective for claims made between January 1, 2014, and January 1, 2015.[7] (ECF No. 196 at Exhibit D-4).

The Ironshore Policy at issue contains several provisions relevant to this lawsuit.  First, the Ironshore Policy states that Ironshore will pay claims in excess of the Underlying Coverage Amount so long as Conemaugh follows the necessary conditions (the "Exhaustion Clause"):

> [Ironshore] shall pay on behalf of [Conemaugh] for loss, damages, settlements and defense expenses by reason of exhaustion of the limits of liability of the [Primary Policy] by the issuers of such [Primary Policy] and/or [Conemaugh], subject to: (1) the terms and conditions of the Primary Policy (as submitted to [Ironshore]), (2) the Limit of Liability stated in ITEM 3 of the Declarations, and (3) the terms and conditions of, and all endorsements attached to, this Policy

---

[5] The Court notes that the ProSelect First-Layer Excess Policy, 2-25167CA, is, as its name states, a *first-layer excess policy*.  The Court refers to the ProSelect policies as Conemaugh's "Primary Policy" because they form a substantial part of the Underlying Coverage Amount which Conemaugh was required to expend before accessing the second-layer Ironshore Policy.

[6] While the lawsuit was filed on October 29, 2015, the parties have not disputed that the Primary Policy would cover the claim at issue if Conemaugh met its terms and conditions.  Accordingly, the Court will presume that the Primary Policy was in effect as of the filing of *Harker*.

[7] The Court will similarly presume that the Ironshore Policy was in effect as of the filing of *Harker*, as no party has disputed this presumption. *See* note 6, *supra*.

(*Id.*, Ironshore Policy § II).

Second, the Ironshore Policy contains a provision requiring Conemaugh to cooperate with Ironshore in the investigation, settlement, or defense of a claim— if Ironshore elects to be involved— and make available all information and records Ironshore may reasonably require (the "Election and Cooperation Clause"):

> [Ironshore] may, at its sole discretion, elect to associate in the investigation, settlement, or defense of any claim against [Conemaugh], even if the Underlying [Coverage Amount] has not been exhausted.   If [Ironshore] so elects, [Conemaugh] will cooperate with [Ironshore] and will make available all such information and records as [Ironshore] may reasonably require.

(ECF No. 196 at Exhibit D-4, Ironshore Policy § VII(B)).

Third, the ProSelect Primary HPL, Policy No. 2-25167HPL, to which the Ironshore Policy follows form, contains a "Known Claims and Circumstances" clause ("Known Claims and Circumstances Clause") stating that:

> This POLICY does not apply to any liability of [Conemaugh] or to any DAMAGES, INCIDENTS, CLAIMS, SUITS, or LICENSING PROCEEDINGS:
> … That was not disclosed to US in the POLICY APPLICATION or in any application submitted to US for prior acts or retroactive coverage and the INSURED or the NAMED INSURED knew or should have known that such INCIDENT, circumstance or situation had the potential to give rise to a CLAIM covered by this POLICY.

(ECF No. 196 at Exhibit D-1, ProSelect Primary HPL Policy § VI(10)(b)(iii)). The term "POLICY APPLICATION" is further defined as meaning:

> …[E]ach application, together with all attachments and other documents submitted to [ProSelect] by or on behalf of the FIRST NAMED INSURED in connection with the underwriting or issuance of this POLICY, including any endorsement.

(*Id.* at ProSelect Primary HPL Policy § VII(14)).   The Ironshore Policy further defines "**Application**" as meaning, "any application furnished to the **Underwriter**, and all other statements made and information furnished to the **Underwriter** and to the issuer(s) of the **Underlying Insurance**, whether directly or through public filing." (*Id.* at Exhibit D-4, Ironshore Policy § III(A)) (emphasis included).

      **b.**    *Harker v. Chan*

On October 29, 2015, Conemaugh and Dr. Chan, among others, were named as Defendants ("*Harker* Defendants") in *Harker v. Chan*, No. 3:15-cv-277, before the Court. (*see Harker*,[8] ECF No. 1). The obligation to pay the settlement in the *Harker* Case provides the basis for the dispute in this case.   The Harkers' Complaint ("*Harker* Complaint") pleaded that Conemaugh and Dr. Chan were responsible, as a result of negligent medical treatment, for the permanent disfigurement of a premature infant, GH,[9] born on ███████████. (*Id.*).

      **i.**    **The Underlying Facts**

*Harker* arose from an allegation that Conemaugh, through Dr. Chan, had negligently treated GH, a prematurely born girl, by wrapping her head with an ACE bandage shortly after birth, causing permanent disfigurement to her face and scalp. (*Harker*, ECF No. 96 at 1).   GH was born at Conemaugh Memorial Medical Center, one of Conemaugh's facilities, on ███████████, and due to her premature birth status, physicians at Conemaugh placed her in the neonatal intensive care unit ("NICU") under the care of Dr. Chan.  (*Id.* at 2).

While GH was under Dr. Chan's care, he observed swelling on her head, an apparently not uncommon finding for newborn babies. (*Id.* at 3). Dr. Chan believed that the swelling was

---

[8] Any references to the record in *Harker v. Chan*, will be to "*Harker*, ECF No. [X] at [Y]."
[9] At the time that *Harker* was filed, GH was a minor and so is referred to solely by her initials.

either a caput, a cephalohematoma or a subgaleal hemorrhage. (*Id.*). The standard treatment for these conditions is monitoring and observing the child, or a blood transfusion, depending on the cause of the swelling.  (*Id.* at 3).  Dr. Chan, however, based upon his medical education, instructed a nurse to wrap GH's head with an ACE bandage, which remained on GH's head for nearly two days.  (*Id.*).  When a nurse removed the bandage, GH's head was bruised and swollen and had abrasions that oozed blood and serum.  (*Id.*).  In addition, GH's head had necrotic tissue where the bandage had been wrapped.  (*Id.*).

Nearly ▮▮▮ weeks following GH's birth, on January 15, 2013, GH was transferred via medical air flight to Texas Children's Hospital in Houston, Texas. (ECF Nos. 197 at Exhibit D-7, p. 57:7-21; 59:22-25; 60:4-6; 180-5 at 25, Exhibit 20, p. 88:21-90:13). Upon arrival in Houston, GH's doctors noted that GH had lost "significant soft tissue," and had suffered "substantial hair loss." (*Harker*, ECF No. 96 at 4).   GH's scalp was also oozing fat, and her skull was compromised. (*Id.*). As a result, GH has undergone several painful procedures and physical therapy, and will require multiple further surgeries and years of treatment, none of which will ever fully remedy the damage caused by the ACE bandage. (*Id.* at 4–5).

ii.   **Conemaugh's MCARE Report**

Following GH's treatment, Conemaugh was required under MCARE to submit a report to the state. 40 P.S. § 1303.308(a).  Specifically, MCARE requires that, "a health care worker who reasonably believes that a serious event or incident has occurred shall report the serious event or incident…" *Id.*  MCARE defines a "serious event" as:

> [a]n event, occurrence or situation involving the clinical care of a patient in a
> medical facility that results in death or compromises patient safety and results in

> an unanticipated injury requiring the delivery of additional health care services to the patient. The term does not include an incident.

40 P.S. § 1303.302. Further, MCARE defines an "incident" as:

> An event, occurrence or situation involving the clinical care of a patient in a medical facility which could have injured the patient but did not either cause an unanticipated injury or require the delivery of additional health care services to the patient. The term does not include a serious event.

*Id.* As the treatment provider for GH, Dr. Chan was contacted by Conemaugh's risk management director, Denise Weinzierl[10] ("Weinzierl"), to review his clinical care of GH and determine if GH's injuries should be reported as a "serious event" or "incident" under the Act. (ECF Nos. 197 at Exhibit D-7, p. 36:15-24; 54:17-56:10; 180-1 at Exhibit 7, p. 36:15-37:17; 40:8-41:17; 92:5-95:5). Based on Dr. Chan's clinical impressions, a review by Quality Nurse Cathie Latch ("Latch"), and an interview of Dr. Chan relating to GH's treatment, Conemaugh's risk management team reported GH's injuries to the state as an "incident" and not a "serious event." (*Id.*; ECF Nos. 180-1 at Exhibit 17, p. 37:3-17; 40:8-41:17; 92:5-94:4; 181-2 at Exhibit 28).

After GH's transfer to Houston, but before the Harkers (the "*Harker* Plaintiffs") filed their complaint, both Weinzierl and Dr. Chan reported they never received any communications about any issues relating to GH's injuries. (ECF No. 197 at Exhibit 6, p. 137:15-138:18; Exhibit 7, p. 48:11-25). In that same period, GH's parents made a $1,700 donation to Conemaugh to "purchase equipment for the RICN [(Regional Intensive Care Nursery)]" (ECF No. 198 at Exhibit D-9), GH's parents had their second child at Conemaugh (ECF No. 197 at

---

[10] Denise Weinzierl was formerly named "Denise Weisbrodt." (ECF Nos. 181 at Exhibit 17, p. 102:3-19; 222 at ¶ 44). For clarity, the Court will refer to all mentions of the name Weisbrodt in the record as Weinzierl.

Exhibit D-6, p. 137:15-138:18), and Dr. Chan reported a pleasant exchange with GH's father in the labor and delivery area of the hospital. (*Id.*).

Conemaugh asserts, and ProSelect concedes, that until the time the *Harker* Plaintiffs filed their Complaint, Conemaugh had no notice that GH's care could give rise to a claim implicating its Primary Policy.[11] (ECF Nos. 193 at Exhibit D-10, p. 63:7-25; 216 at ¶ 19).   At the time the *Harker* Plaintiffs filed their Complaint, ProSelect did not disclaim coverage nor did it issue a reservation of rights letter to Conemaugh. (*Id.*).

### iii.   Counsel Selection for the *Harker* Case

Before the *Harker* litigation began, Coverys contacted Conemaugh and asked Conemaugh to submit attorneys it had previously worked with as potential members of panel counsel. (ECF No. 260-6 at p. 237:21-238:15).  Coverys maintained a panel of attorneys who were eligible to represent Coverys' insureds in litigation. (ECF No. 260-1 at Exhibit 71, p. 302:2-10). Among a few other firms, Conemaugh provided Coverys with Michael Sosnowski's ("Sosnowski") law firm, McIntyre, Hartye, Schmitt & Sosnowski. (ECF No. 260-6 at p. 237:21-238:15). Conemaugh had a longstanding relationship with Sosnowski as it had worked with him on a number of matters since approximately 1996. (ECF Nos. 260-6 at p. 23:14-24:17; 237:13-20; 226 at ¶ 80).

Following the filing of the *Harker* Complaint, Coverys began the process of selecting counsel to represent Conemaugh. (ECF No. 193 at Exhibit D-10, p. 21:16-23:4). During this process, Conemaugh requested Sosnowski to represent it in the litigation. (ECF No. 226 at ¶ 77).

---

[11] Ironshore does not concede that Conemaugh had no notice that GH's care could give rise to a claim that could implicate the Ironshore Policy. (ECF No. 217 at 18-23).

On November 13, 2015, Coverys claims manager Joan Harris ("Harris") emailed Sosnowski requesting that he file an appearance on behalf of Conemaugh. (ECF No. 193 at Exhibit D-11). Sosnowski responded to Harris's email by thanking her for the assignment and informing her that he had already spoken with Dr. Chan via phone. (*Id.*). As panel counsel accepting an assignment from Coverys, Sosnowski was required, per Coverys' Case Management Guidelines, to:

> [A]cknowledge and agree that they are independent contractors, that they are solely responsible for directing and controlling the details of the insured's defense, and that they owe an ethical obligation to the insured to exercise their independent professional judgment in the matters concerning the defense of the insured.

(ECF No. 185-1 at 5).

### iv. Pre-Trial Communication between Sosnowski, Coverys and Conemaugh

On January 14, 2016, Sosnowski's Secretary, Brenda Ermin ("Ermin"), sent a summary of Sosnowski's initial meeting with Dr. Chan to Coverys Senior Claim Representative, Jacqueline Busterna ("Busterna"). (ECF No. 196 at Exhibit D-5). Weinzierl was also copied on the email. (*Id.*). In that summary, Sosnowski recounted Dr. Chan's explanation that he treated GH as though she had a subgaleal hemorrhage, or bleeding under the scalp, by wrapping GH's head to reduce the swelling of the hemorrhage. (*Id.*).

Several months later, on November 28, 2016, Sosnowski sent Coverys Claims Consultant Jeffrey Small[12] ("Small") a letter summarizing the depositions of Corradina Baldacchino and Ian Harker, GH's parents. (ECF No. 193 at Exhibit D-15). Weinzierl was also copied on Sosnowski's

---

[12] Small was assigned to the *Harker* Case in early November 2016. (ECF No. 193 at Exhibit D-14, p. 26:5-7). Harris served as Small's supervisor beginning in November 2016. (*Id.* at 38:5-25; 62:4-16).

letter. (*Id.*). With respect to GH's parents, Sosnowski informed Small and Weinzierl that "they are both excellent, and will make very sympathetic witnesses." (*Id.*). Sosnowski further emphasized that GH's parents' testimonies,

> [C]ombined with the appearance of their daughter and the numerous photographs and videos that they will be able to put forward, will make for a very compelling, emotional case that will certainly enhance any damages, but could also negatively impact on liability for the defense.

(*Id.*). Sosnowski concluded the letter to Small and Weinzierl by informing them that "if we do not have rock solid liability defense, this case will be very difficult to put before a jury." (*Id.*).

A few weeks later, on December 21, 2016, Sosnowski sent Small a letter and CD-Rom which contained photographs and videos of GH showing "the initial period following the birth of the Harker baby." (*Id.* at Exhibit D-16). Weinzierl was not copied on Sosnowski's letter. (*Id.*). In that letter, Sosnowski informed Small that, "having reviewed [the photographs and videos], it does not appear that there is anything noteworthy with respect to the claims in this case…" (*Id.*). Upon conducting his own review of the photographs and videos, Small knew a jury would be sympathetic to the images and thought that the facts and injuries of GH were potentially inflammatory. (ECF Nos. 193 at Exhibit D-14, p. 96:11-22; 216 at ¶ 35).

On May 22, 2017, Sosnowski sent a letter to Small, copying Weinzierl, which provided a summary of Dr. Chan's and Dr. Shayesteh's depositions. (ECF No. 193 at Exhibit D-17). In that summary, Sosnowski informed Small and Weinzierl that, "[f]rom a standard of care perspective, [Dr. Chan] acknowledged that he is unaware of anyone else who utilizes this head wrapping technique to treat subgaleal hemorrhage," and that he was "unable to point out any North American medical literature that referenced it." (*Id.*). Sosnowski also warned that, "[t]he

fact that Dr. Chan is not a strong witness is also not helpful." (*Id.*). He also stated that, "[t]he plaintiff parents are both personable and engaging, and obviously devoted to their daughter. The pictures of this child, who is now four and a half, tug at the heart strings to say the least." (*Id.*). Sosnowski concluded his review of the depositions by informing Small and Weinzierl that he would send a separate letter to summarize his discussions with the *Harker* Plaintiffs' counsel. (*Id.*).

A separate letter was sent to Small, copying Weinzierl, dated May 22, 2017, in which Sosnowski summarized his conversation with attorney for *Harker* Plaintiffs, Dominic Guerrini ("Guerrini"). (ECF No. 193 at Exhibit D-18).  In that letter, Sosnowski relayed to Small and Weinzierl that Guerrini believed that the *Harker* Case was a "more significant [case] than one that he had tried against one of [Sosnowski's] partners recently, which resulted in a $14 million dollar [*sic*] verdict." (*Id.*).  Sosnowski noted he was "quietly taken back by that, given that [the $14 million] case involved a cerebral palsy baby." (*Id.*).  Despite Guerrini's high valuation of the *Harker* Case, Sosnowski shared this information with Small and Weinzierl so they would "understand that when a very large demand is made, that it is coming from a place of legitimacy." (*Id.*).  Sosnowski concluded his letter by sharing with Small and Weinzierl that he was "not optimistic about being able to credibly defend the case on liability." (*Id.*).

On June 28, 2017, Sosnowski sent a letter to Small, copying Weinzierl, informing them that the *Harker* Case had a trial date set for March 19, 2018.[13] (ECF No. 193 at Exhibit D-19). Small contacted Harris in September 2017 and informed her of the potential exposure of the

---

[13] Weinzierl, although copied on the letter Sosnowski sent to Small, denies that she received the letter and maintains she was unaware of the trial date at the time. (ECF Nos. 182-1 at Exhibit 37; 222 at ¶ 44; 177 at ¶ 44-45).

*Harker* Case. (ECF No. 193 at Exhibit D-14, p. 38:5-25). Around this same time, in late 2017, Coverys corporate representative Stephanie Sheps ("Sheps") was made aware of an "initial demand" by *Harker* Plaintiffs' counsel to settle the *Harker* Case for $20 million. (ECF No. 193 at Exhibit D-10 at p. 191:14-194:16). Coverys maintains that the *Harker* Plaintiffs' $20 million demand was more an "informal conversation" than a formal demand. (ECF Nos. 246 at ¶ 46; 260-1 at p. 137:7-138:24).

On September 22, 2017, at Small's request, Sosnowski emailed Small an updated litigation management plan, stating that the case, "had not developed well for us." (ECF No. 193 at Exhibit D-20). Weinzierl was not copied on the email and litigation management plan. (*Id.*). In Sosnowski's litigation management plan, after reviewing the *Harker* Plaintiffs' theory of the case, the *Harker* Defendants' possible defenses and potential expert witnesses, Sosnowski warned Small that "[t]his is not looking like a case to try." (*Id.*). Sosnowski also warned that "any settlement effort may prove difficult because [Kline & Specter] typically makes extraordinarily high demands," and they "don't negotiate down very well." (*Id.*). Further, Sosnowski stated it was possible that the "[*Harker* Plaintiffs'] demand will reach eight figures." (*Id.*). Finally, Sosnowski relayed that, "no demand has been made at this point," and that he suspected they would receive a demand once the *Harker* Plaintiffs file their economic reports. (*Id.*).

### A. Pre-Trial Communications About Expert Witnesses Between Sosnowski, Coverys and Conemaugh

The litigation management plan Sosnowski sent on September 22, 2017, which Weinzierl was not copied on, listed three potential defense experts: (1) pediatric radiologist Kristen Crisci,

M.D., (2) neonatologist Mitchell Kresch, M.D., and (3) pediatric plastic surgeon Joseph Lossee, M.D. (ECF No. 193 at Exhibit D-20).   With respect to Dr. Crisci, Sosnowski stated in his summary that Dr. Crisci believed that Dr. Chan's finding of a subgaleal hemorrhage was incorrect. (*Id.*; ECF No. 216 at ¶ 53).   Regarding Dr. Kresch, Victoria Kellogg ("Kellogg") from Sosnowski's law firm, sent a letter to Small[14] on November 20, 2017, summarizing a phone call she had with Dr. Kresch where Dr. Kresch informed Kellogg that he believed Dr. Chan had "breached the standard of care when he ordered the wrapping of [G.H.'s] head and such breach was the cause of [her] injuries." (ECF No. 193 at Exhibit D-21).

Dr. Lossee was unable to participate as an expert witness in the *Harker* Case. (ECF No. 193 at Exhibit D-23). On December 4, 2017, Sosnowski sent a letter to Small, copying Weinzierl, summarizing a conversation he had with Dr. Richard Redett, a pediatric plastic surgeon who was substituted for Dr. Lossee. (*Id.*).   In that letter, Sosnowski informed Small and Weinzierl that Dr. Redett agreed with the *Harker* Plaintiffs' plastic surgery expert witness that only Dr. Chan's head wrapping could have caused GH's injuries. (*Id.*). Sosnowski concluded his letter by stating that, "[g]iven that all of the plastic surgery experts that we are aware of (our two plus the plaintiffs' one) have said virtually the same thing, it does not appear as though we will be developing any type of causation defense in this case matter." (*Id.*).

On December 28, 2017, Sosnowski sent a letter to Small, copying Weinzierl, summarizing a phone call he had with life care planner Trudy Koslow ("Koslow"). (ECF No. 193 at Exhibit D-25).   In Sosnowski's summary, he recounted Koslow's points of agreement and

---

[14] ECF No. 193 at Exhibit D-21 includes the name "Denise" on the copy line. (ECF No. 193 at Exhibit D-21).   It is unclear upon reviewing Exhibit D-21 if Weinzierl received a copy of the letter. (*Id.*).

disagreement with the *Harker* Plaintiffs' life care plan totaling $1,535,587.47. (*Id.*).  Sosnowski concluded his summary by quoting Koslow as saying that, "Dr. Chan did not come across well in his deposition.  He came across as having no reason for doing the head wrapping and no plan once he did it.  It was like he was making up the protocol as he went along." (*Id.*).

An internal Coverys status report created by Small was circulated to Harris sometime in December 2017 or January 2018. (ECF No. 193 at Exhibit D-14, p. 262:14-263:9; Exhibit D-26).  In Small's report, he indicated that the *Harker* Defendants "lack[ed] a solid defense argument and in the face of a compelling and sympathetic injury to this child, [he] recommend[ed] mediation as the most suitable forum to negotiate the claim with Kline & Specter." (ECF No. 193 at Exhibit D-14 p. 264:3-9; Exhibit D-26).

### v. Pre-Trial Mediation and Settlement Communications between Sosnowski, Coverys and Conemaugh

Generally speaking, Coverys would have conversations with its insureds about obtaining consents to settle when it became "clear to the claims team that a case needs to be settled." (ECF Nos. 193 at Exhibit D-10, p. 31:11-21; 215 at ¶ 70).  By January 2018, Coverys had been made aware by Sosnowski that Dr. Chan had breached the standard of care when he ordered the wrapping of GH's head (*Id.* at Exhibit D-21), and that Sosnowski could not develop any type of causation defense. (*Id.* at Exhibit D-25).

On February 5, 2018, Sosnowski sent an email to Harris and Small informing them of a conversation he had with Guerrini in which Sosnowski communicated his desire to "try to reach an amicable resolution to [the *Harker*] case…". (ECF No. 193 at Exhibit D-27).  Sosnowski told Harris and Small that he requested consent from Guerrini to continue the March 19, 2018,

trial date, but Guerrini declined. (*Id.*). Sosnowski also relayed that he and Guerrini discussed the Court's ADR policy, the Court's preferences, and settlement efforts. (*Id.*). Sosnowski also communicated to Harris and Small that Guerrini would inform Judge Gibson that "the plaintiffs (of course) are willing to make any reasonable effort to resolve this case." (*Id.*) (emphasis included). Sosnowski concluded his letter by informing Harris and Small that he "remain[ed] available to transmit a Consent to Settle to Dr. Chan." (*Id.*).

By February 2018, Sosnowski, Coverys, and Weinzierl were aware that an unfavorable verdict was likely if the *Harker* Case proceeded to trial. (ECF Nos. 199 at Exhibit D-22). On February 5, 2018, Small emailed Sosnowski asking him to confirm the schedule of Judge Scanlon, the parties' mediator. (ECF No. 193 at Exhibit D-29, Exhibit D-14 at p. 265:5-16). Sosnowski had previously informed Small and Harris that prior to March 19, 2018, Judge Scanlon had one day he was available to mediate. (*Id.* at Exhibit 27). In Small's email to Sosnowski, Small informed Sosnowski that Coverys would like to schedule a mediation date for "*after* the 3/19/18 trial date." (*Id.* at Exhibit D-29) (emphasis included).

In a pretrial report prepared by Sosnowski on February 20, 2018, Sosnowski relayed that he had no liability defense, he had no expert support, Dr. Chan himself admitted that "nobody else did [what he did to GH]," settlement was highly unlikely because of the excessive demands likely to be made by *Harker* Plaintiffs and their counsel, and that a verdict could be as high as $10 million. (ECF No. 193 at Exhibit D-31). Despite Sosnowski's grim view of the *Harker* Case, Conemaugh maintains that Sosnowski was not permitted to "broach the topic of settlement" without prior approval by Coverys. (ECF Nos. 191 at ¶ 82; ECF No. 193 at Exhibit D-28, p. 299:6-16). Conversely, Coverys argues that nothing prevented Sosnowski from discussing settlement

with opposing counsel, rather it was only when formal offers were to be extended that Sosnowski was required to receive consent. (ECF Nos. 216 at ¶ 82; 260-1 at p. 298:19-301:21). Regardless, both Conemaugh and Coverys concede that no formal offer for settlement could be extended to the *Harker* Plaintiffs without consent from Coverys. (ECF Nos. 191 at ¶ 84; 216 at ¶ 84).

### vi. Pre-Trial Communications Between Conemaugh and Ironshore

Nearly a week after the *Harker* Complaint was filed, on November 5, 2015, Conemaugh Risk Management team member, Susan Ulatsky ("Ulatsky"), sent Ironshore a copy of the Complaint (ECF No. 198 at Exhibit D-11), which Ironshore acknowledged the following day. (*Id.* at Exhibit D-12). In a letter attached to Ironshore's email (the "Acknowledgement Letter"), Ironshore informed Conemaugh that it had placed the *Harker* Case in a bordereau file (HCL 00034679) and had "determined that an individual claim file(s) is not required at this time." (*Id.*). The Acknowledgment Letter also requested that Conemaugh contact Ironshore immediately should Conemaugh:

> (1) Receive a settlement demand in excess of [Conemaugh's] policy attachment
> (2) Intend to proceed to trial on the reported claim; or
> (3) Otherwise determine that our layer of coverage may be impacted.

(*Id.*). Finally, the Acknowledgment Letter concluded with Ironshore "reserv[ing] all rights to which it is entitled under the policies and at law." (*Id.*).

On January 26, 2016, Ironshore's Assistant Vice President of Claims, Starr Lander ("Lander"), emailed Ironshore's Vice President of Claims, Jeffrey Brown ("Brown"), a report of an in-depth audit and review of Conemaugh's claims. (*Id.* at Exhibit D-13). In that email, Starr

indicated that the *Harker* Case had been "reviewed" and that the *Harker* Case would not be monitored due to "low exposure." (*Id.*).

Over a year later, on April 17, 2017, Lander emailed Ulatsky and asked if (i) Conemaugh had any other serious cases that Ironshore should be monitoring and (ii) if any other cases were scheduled for trial in the next six months. (*Id.* at Exhibit D-14).   Receiving no response, Lander followed up with Ulatsky on June 14, 2017, asking if there were any trials or mediations scheduled in the next six months. (*Id.*).   The following day, on June 15, 2017, Ulatsky emailed a list of "cases reported to excess," which included *Harker*. (*Id.*).   With respect to *Harker*, Ulatsky informed Lander that, "[e]xpert views unfavorable, problematic in light of a child with disfiguring marks on head." (*Id.*).   Ulatsky did not include a trial date for *Harker* because, at the time she emailed Lander, no trial date had been set. (ECF Nos. 195 at ¶ 36; 218 at ¶ 36). However, approximately two weeks later on June 28, 2017, the Court set a trial date of March 19, 2018. (ECF No. 199 at Exhibit D-16).   With a trial date set, Sosnowski sent a letter to Small informing him of *Harker's* scheduled trial date. (ECF No. 182-1 at Exhibit 37).   Weinzierl, although copied on the letter Sosnowski sent to Small, denies that she received the letter and maintains she was unaware of the trial date at the time. (*Id.*; ECF No. 177 at ¶ 44).

Several months later, on or around January 30, 2018, Sosnowski provided Weinzierl an in-person briefing about the *Harker* Case that left her "alarmed" and "disturbed." (ECF Nos. 177 at ¶ 46; 222 ¶ 46).   At that briefing, Sosnowski informed Weinzierl that the defense, "had no experts to testify to standard of care." (*Id.*). Sosnowski's briefing prompted Weinzierl to contact Ironshore. (ECF Nos. 177 at ¶ 47; 222 ¶ 47). Weinzierl called Ironshore Claims Analyst Connor Niessing ("Niessing"), but he was out-of-office. (ECF No. 180-2 at Exhibit 18, p. 44:8-46:19).

Upon learning Niessing was out-of-office, Weinzierl called and spoke with Ironshore Claim Technical Analyst Cheryl Scott ("Scott"). (*Id.*). During that phone call, Weinzierl informed Scott that Conemaugh "had no experts to testify for this case with regard to standard of care," but did not inform Scott of the *Harker* Case trial date. (ECF Nos. 177 at ¶¶ 47-48; 222 at ¶¶ 47-48). Scott then informed Weinzierl she would have someone call her back. (ECF No. 180-1 at Exhibit 17, p. 133:25-134:4). Niessing then called Weinzierl and asked her questions about the case. (*Id.* at p. 134:5-11). Weinzierl told Niessing she could not answer all of his questions, but she would get Sosnowski to provide Niessing a case summary so Niessing would have Sosnowski's contact information and he could reach out to Sosnowski directly if he had further questions. (*Id.* at p. 134:12-21). Additionally, on February 1, 2018, Scott emailed Niessing a summary of her discussion with Weinzierl. (ECF No. 199 at Exhibit D-20). Scott informed Niessing (i) that Weinzierl had advised her that the *Harker* Case "will hit the excess layer, and possibly Ironshore's layer of coverage," (ii) that the *Harker* Plaintiffs' counsel was Kline and Specter and that they "might" want to mediate the case, and (iii) that "none of the insured's experts can agree on this case." (*Id.*).

On February 2, 2018, Niessing emailed Ulatsky and Weinzierl asking for an update on the cases Ulatsky had previously provided updates for in her June 15, 2017 email. (*Id.* at Exhibit D-21). In that same email, Niessing thanked Weinzierl for her call to the claims department with respect to the *Harker* Case and informed her that a file would be opened to follow future developments. (*Id.*). A few days later, on February 6, 2018, Ulatsky emailed Niessing the status report that Weinzierl had requested Sosnowski prepare for Ironshore. (ECF No. 182-6 at Exhibit 42). A copy of the same report was sent to Scott. (ECF No. 199 at Exhibit D-22). That status

report (the "*Harker* Report"), dated February 5, 2018, indicated that Conemaugh was likely to receive an unfavorable verdict, and estimated that liability would likely top out at or near $10,000,000, which Sosnowski considered an "extreme figure." (*Id.*). The *Harker* Report did not include a trial date for the *Harker* Case. (*Id.*).

On February 9, 2018, Brown sent an email to Ironshore Claims Officer Richard Tatlock ("Tatlock"), asking him to set up a file to monitor the *Harker* Case. (*Id.* at Exhibit D-20). In a letter dated February 13, 2018, Ironshore informed Conemaugh that the *Harker* Case had been assigned a file number (HCL00070959) and that Tatlock had been assigned to handle the case. (*Id.* at Exhibit D-25). Ironshore concluded its letter to Conemaugh by expressly reserving "all rights under its policy, all underlying insurance (if applicable), and available law and equity." (*Id.*). That same day, Tatlock emailed Ulatsky and Weinzierl informing them that he had set up a file for the *Harker* Case and asked to have counsel copy him on "all significant correspondence." (ECF No. 200 at Exhibit 26). Ulatsky responded that she had "notified Attorney Sosnowski to copy [Tatlock] on significant correspondence," and provided Tatlock with Sosnowski's contact information. (*Id.*). That same day, Sosnowski confirmed receipt of Ulatsky and Weinzierl's email and informed them he would add Tatlock to his "important stuff" list. (ECF No. 182-8 at Exhibit 44).

On March 6, 2018, Tatlock emailed Ulatsky informing her again that he had set up a separate file for the *Harker* Case and requested that defense counsel copy him on any "significant correspondence." (ECF No. 200 at Exhibit D-28). Ulatsky forwarded Tatlock's email to Sosnowski that same day. (*Id.*).

### vii. Pre-Trial Offers to Settle the *Harker* Case

On March 16, 2018, three days before trial, an MCARE attorney emailed a cash settlement offer of $1,600,000 to Kline & Specter to resolve the *Harker* Case. (ECF Nos. 191 at ¶ 90; 216 at ¶ 90; 52 at ¶ 32). MCARE's offer was declined. (*Id.*). On the first day of trial, March 19, 2018, MCARE made an additional settlement offer to Kline & Specter for $2 million to which the *Harker* Plaintiffs never responded. (ECF No. 193 at Exhibit D-14, p. 187:5-18).

### viii. The Trial, Verdict, Remittitur and Communications Between Conemaugh, Coverys and Ironshore During Trial

The *Harker* trial began on March 19, 2018, and proceeded for four days. (*Harker*, ECF Nos. 65–72). No Ironshore representative was present at the beginning of the trial. (ECF No. 218 at ¶ 60).

On March 21, 2018, the third day of trial, Weinzierl called Tatlock and left the following voicemail:

> Hi Rich, this is Denise Weinzierl from Conemaugh Memorial Hospital in Johnstown, Pennsylvania. I'm calling about the Harker case. That's the one that—it's the five or six year old child that you recently opened a file up on—I'm sorry I don't know the file number. At any rate, it's in trial this week, and I know our attorney sent you a summary of the case. Again, I don't have a file number for this. It's Harker, H-A-R-K-E-R. I just wanted you to know they would probably have closing statements tomorrow in the trial and we are probably going to get a—I anticipate a negative verdict. I'm not sure how much so if you could please call me at 814-534-9535. And ask for me, Denise Weinzierl. I'm on the other line but I will get off that line to answer your call. That's 814-534-9535. Thank you.

(ECF Nos. 177 at ¶ 63; 222 at ¶ 63). Upon receipt of Weinzierl's voicemail, Tatlock called Weinzierl back and the two spoke on the phone. (ECF Nos. 195 at ¶ 62; 218 at ¶62). During that phone call, Tatlock told Weinzierl to issue a demand to settle letter to Coverys immediately.

(ECF No. 197 at Exhibit D-7, p.188:19-24, 243:16-21).  Ironshore also retained and dispatched counsel to monitor the trial. (ECF No. 222 at ¶ 65).

That same day, March 21, 2018, the Court issued its Rule 50 Order, granting judgment as a matter of law on the issue of liability, finding that no reasonable jury could find that Conemaugh was not liable for the *Harker* Plaintiffs' claims. (ECF No. 200 at Exhibit D-49). Following the Court's Rule 50 Order, Weinzierl emailed Small a letter, copying Tatlock and Harris, demanding that "Covery's [*sic*] confirm immediately that it will provide full settlement authority to defense counsel in an amount equal to the remaining policy limits, so that defense counsel may attempt to negotiate a settlement within Covery's [*sic*] policy limits while this is still possible." (*Id.* at Exhibit D-31; ECF No. 193 at Exhibit D-33).

The next day, on March 22, 2018, Harris replied to Weinzierl's email, copying Tatlock and Sosnowski, confirming receipt of Weinzierl's letter. (ECF No. 200 at Exhibit D-33). Harris's email also informed Weinzierl that "[the *Harker*] Plaintiffs' counsel ha[d] refused to negotiate until this morning when [*Harker* Plaintiffs' counsel] advised his clients' rock bottom, non-negotiable demand is $15M." (*Id.*).  Harris indicated that Coverys had asked Sosnowski to "extend a formal offer of $5M from the ProSelect policies which when combined with the $1M already offered by Mcare will bring the full settlement offer to $6M." (*Id.*).  ProSelect had approved the $5 million amount that same day. (ECF No. 187-18 at Exhibit 54).  A formal offer letter was sent by Harris to Guerrini, offering a total settlement amount of $6 million (ECF No. 200 at Exhibit D-37).  The $6 million offer was immediately rejected. (*Id.* at Exhibit D-38). Sosnowski sent an email to Harris informing her that the authorized offer had been rejected and

that Guerrini was holding firm at $15 million to settle. (*Id.*). The jury then returned a verdict in the amount of $47,033,589 for the *Harker* Plaintiffs. (*Id.* at Exhibit D-39).

That same day, March 22, 2018, Ironshore, acting through counsel, sent a letter to Conemaugh and Coverys. (ECF No. 206-50 at Exhibit 49).  In that letter, Ironshore stated:

> [Ironshore is] evaluating whether Ironshore has claims against Conemaugh and/or Coverys for breach of fiduciary duty, common law bad faith, and/or statutory bad faith. Ironshore expressly reserves its rights under the Ironshore Policy to seek an assignment of any rights Conemaugh has against Coverys, or barring that, to proceed under a theory of equitable subrogation, as a result of any excess verdict.  Ironshore further reserves its rights to deny coverage to the extent Conemaugh breached its notice and cooperation obligations under the policy. (*Id.*).

(*Id.*).  A few days later, on March 28, 2018, Tatlock emailed Sosnowski asking for Sosnowski to call and discuss the *Harker* Case. (ECF No. 200 at 36).   Following a phone call between Sosnowski and Tatlock, Sosnowski emailed Tatlock a copy of the "Coverys Pretrial Report," and Sosnowski's "case assessment dated 2/5/18 that Denise Weinzierl requested." (*Id.*). Sosnowski also noted that he "inadvertently did not copy Denise [Weinzierl] on the Pretrial Report." (*Id.*).

On April 2, 2018, counsel for Coverys, Tamara Wolfson ("Wolfson"), responded to Ironshore's March 22, 2018 letter, stating several mistakes and/or misunderstandings it perceived on the part of Ironshore. (ECF No. 199 at Exhibit D-23).  Over a month later, on May 14, 2018, Harris emailed Tatlock informing him that she had asked Sosnowski to provide Tatlock with copies of the motions filed on behalf of Conemaugh and Dr. Chan.  (ECF No. 200 at Exhibit D-41).  In that email, Harris also confirmed that she was sending Tatlock the filings because Tatlock had indicated that he had not received copies of the motions filed by defense

counsel. (*Id.*). Harris followed up with Tatlock two days later on May 16, 2018, inquiring if he had had a chance to review the filings so they could schedule their next discussion. (*Id.*). Receiving no response, on May 21, 2018, Harris followed up again with Tatlock asking for a status update and inquiring "if [Ironshore] would like to approach the *Harker* Plaintiffs together with respect to a settlement offer before *Harker* Plaintiffs' motion brief is due." (*Id.* at Exhibit 42). Receiving an out-of-office message from Tatlock, Harris emailed Brown and asked for a response "to see if Ironshore is interested in jointly reaching out to plaintiff's [*sic*] in an attempt to negotiate a settlement before their motion brief is due." (*Id.* at Exhibit D-43).

During that same time frame, on May 18, 2018, Sosnowski moved for post-trial relief, requesting a new trial or, in the alternative, a remittitur of the damages award. (*Harker*, ECF No. 86). On June 18, 2018, Coverys formally tendered its "total underlying policy limits of $11,000,000 to Ironshore, together with the Mcare coverage totalling $12,000,000, for Ironshore's use in negotiating a settlement of the Harker's claims." (ECF No. 189-4 at Exhibit 53). One month later, on July 18, 2018, Ironshore sent a letter to counsel for Conemaugh, Marc Tepper ("Tepper"), expressly reserving its rights to deny coverage because of Conemaugh's alleged breach of the Ironshore Policy. (ECF No. 189-6 at Exhibit 55). Ironshore simultaneously sent a letter to counsel for Coverys which (i) informed Coverys of Ironshore's continued reservation of rights, (ii) reminded Coverys of their ongoing defense obligations in the *Harker* Case, and (iii) attacked several claims made in Coverys April 2, 2018, letter to Ironshore. (ECF No. 189-7 at Exhibit 56).

On July 27, 2018, the Court entered an order remitting the jury's award to $19,283,579. (*Harker*, ECF No. 96).

### ix. Ironshore's Settlement Communications with *Harker* Plaintiffs

Following the Court's remittitur order, on July 30, 2018, Ironshore sent a letter updating Wolfson with respect to its settlement communications with the *Harker* Plaintiffs. (ECF No. 189-8 at Exhibit 57). In that letter, counsel for Ironshore reiterated its reservation of rights under the policy and applicable law and recounted the negotiations it purported to have with the *Harker* Plaintiffs. (*Id.*). Specifically, counsel for Ironshore stated that the *Harker* Plaintiffs believed that Coverys' tendered $12 million alone would not be considered a credible offer. (*Id.*). Ironshore further stated its belief that, given the remittitur order, the *Harker* Plaintiffs would reconsider their position. (*Id.*). Ironshore also wrote that although it expected Conemaugh and Coverys to cover any figure above the $12 million already offered, "Ironshore would be willing to consider a joint offer to plaintiffs with some contribution from its limits if necessary." (*Id.*). Ironshore concluded the letter by reserving rights to bring claims against Conemaugh and Coverys in the future. (*Id.*).

In response to Ironshore's letter, on July 31, 2018, Conemaugh sent a letter to Ironshore alleging Ironshore had an obligation "to do more than nothing," and asserted that Coverys "chose to roll the dice" with the *Harker* Case. (ECF No. 189-9 at Exhibit 58). Conemaugh also requested that Ironshore place a litigation hold on all relevant documents and reserved all applicable rights. (*Id.*). Thereafter, on August 1, 2018, the instant suit was filed. (ECF No. 1).

On August 15, 2018, Coverys and Ironshore agreed to accept the *Harker* Plaintiffs' offer to resolve the *Harker* Case for $18,011,836.10 (the "*Harker* Settlement"). (ECF Nos. 195 at ¶ 91; 218 at ¶ 91). Under the terms of the agreement, Coverys would pay $11,000,000, MCARE would pay $1,083,678, and Ironshore would pay the remaining $5,928,158.10. (*Id.*).

x.   Ironshore's Claims-Handling Policies and Procedures During the *Harker* Case

No one from Ironshore independently checked the *Harker* docket to monitor the scheduling of significant dates and/or deadlines in the case. (ECF Nos. 200 at Exhibit D-46, p. 23:10-12; 199 at Exhibit D-24, p. 60:9-12; 218 at ¶92).   However, Ironshore maintains that it would have been outside the ordinary course of business for a claims staff member to have access to a case's docket and to check that docket with any frequency for updates. (ECF No. 206-5 at Exhibit 5, p. 10). Further, Ironshore did not provide "formal training to its claims employees." (ECF No. 218 at ¶ 93).

IV.   **Procedural History**

Ironshore filed its Complaint against Conemaugh on August 1, 2018. (ECF Nos. 1, 2). Ironshore subsequently filed a First Amended Complaint on September 19, 2018, seeking: (1) declaratory judgment for breach of the "Cooperation Clause" in the Ironshore Policy (Count I), (2) declaratory judgment for breach of the "Known Claims and Circumstances Exclusion" in ProSelect Primary HPL, Policy No. 2-25167HPL, to which the Ironshore Policy follows form (Count II), and (3) Restitution of Indemnity Expenses Paid under a theory of Unjust Enrichment (Count III). (ECF No. 12).

Following the Court's denial of Conemaugh's Motion to Dismiss Ironshore's First Amended Complaint (ECF No. 33), Conemaugh filed an Answer and Counterclaim against Ironshore on April 10, 2019.   (ECF No. 40).   Conemaugh brings three counterclaims against Ironshore: (1)  Breach of Contract (Count I), (2) Breach of the Covenant of Good Faith and Fair Dealing (Count II), and (3) Bad Faith Pursuant to 42 Pa. C.S.A. § 8371. (ECF No. 40).  In addition, on April 19, 2019, Conemaugh filed a Third-Party Complaint against ProSelect, bringing claims

for: (1) Breach of Contract (Count I),  (2) Bad Faith Pursuant to 42 Pa. C.S.A. § 8371 (Count II), and (3)  Contribution (Count III).  (ECF No. 46).

Conemaugh moved for summary judgment against Ironshore on July 23, 3021. (ECF No. 174).  Ironshore responded in opposition on August 31, 2021 (ECF No. 217), and Conemaugh replied on September 16, 2021. (ECF No. 248).  Ironshore also responded to the "New Matter" included in Conemaugh's response to Ironshore's motion. (ECF No. 250).

Ironshore moved for partial summary judgment against Conemaugh on July 23, 2021. (ECF No. 173).  Conemaugh responded in opposition on September 1, 2021 (ECF No. 222), and Ironshore replied on September 16, 2021. (ECF No. 247). On November 24, 2021, Ironshore asked leave of the Court to file a supplemental authority in further support of its motion for partial summary judgment against Conemaugh (ECF No. 255), which the Court granted on November 29, 2021. (ECF No. 256). Ironshore's supplemental authority in further support of its motion for partial summary judgment can be found at ECF No. 255-1, Exhibit A.  In response, Conemaugh moved for leave to file a response to Ironshore's supplemental authority on January 7, 2022. (ECF No. 257), which the Court granted on January 10, 2022. (ECF No. 258). Conemaugh's response to Ironshore's supplemental authority can be found at ECF No. 259.

ProSelect moved for summary judgment against Conemaugh on July 23, 2021. (ECF No. 171).  Conemaugh responded in opposition on September 1, 2021 (ECF No. 225), and ProSelect replied on September 16, 2021. (ECF No. 243).  Simultaneously, Conemaugh moved for summary judgment against ProSelect on July 23, 2021. (ECF No. 172).  ProSelect responded in opposition on September 15, 2021 (ECF No. 242), and Conemaugh replied on September 17,

2021. (ECF No. 251). ProSelect also responded to the "New Matter" included in Conemaugh's

Concise Statement of Undisputed Facts. (ECF No. 244).

## V.    Legal Standard

The Court will grant summary judgment "if the movant shows there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a); *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010) (quoting *Ruehl v.*

*Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986). There is a genuine dispute of fact "if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986); *see also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that

affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248. The Court's role

is "not to weigh the evidence or to determine the truth of the matter, but only to determine if

the evidence of record is such that a reasonable jury could return a verdict for the nonmoving

party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). In deciding a

summary judgment motion, this Court "'must view the facts in the light most favorable to the

nonmoving party and draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers*

*Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir.

1994)).

The moving party bears the initial responsibility of stating the basis for its motion and

identifying those portions of the record that demonstrate the absence of a genuine issue of

material fact. *Celotex*, 477 U.S. at 323. If the moving party meets this burden, the party

opposing summary judgment "may not rest upon the mere allegations or denials" of the

pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n.11 (1986)). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993); *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (noting that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue").

The standard for summary judgment "does not change when the parties cross-move for summary judgment." *Krist v. Person Education, Inc.*, 419 F. Supp. 3d 904, 907 (E.D. Pa. December 2, 2019) (citing *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016)). When both parties move for summary judgment, "'[t]he court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard.'" *Id.*

## VI.     Discussion

### a.     The Court Will Deny Conemaugh's Motion for Summary Judgment Against Ironshore (ECF No. 174)

Conemaugh contends that its motion for summary judgment against Ironshore should be granted because (i) Ironshore's claims are barred by the doctrines of waiver and estoppel, (ii) Conemaugh did not breach the Election and Cooperation Clause, (iii) Conemaugh did not

breach the Known Claims and Circumstances Clause, and (iv) Conemaugh was not unjustly enriched by Ironshore. (ECF No. 194).

Ironshore argues in opposition that Conemaugh's motion for summary judgment should be denied because (i) Ironshore's claims are not barred by the doctrines of waiver and estoppel, (ii) Conemaugh breached the Election and Cooperation Clause, (iii) Conemaugh breached the Known Claims and Circumstances Clause, and (iv) Conemaugh was unjustly enriched by Ironshore's settlement payment. (ECF No. 217).

### i.    Ironshore's Claims are Not Barred by the Doctrines of Estoppel or Waiver

### A.  The Parties' Arguments

Conemaugh argues that Ironshore should be estopped from bringing its claim that Conemaugh breached the Known Claims and Circumstances Clause because the claim is barred by "the Doctrines of Waiver and Estoppel." (ECF No. 194 at 15-17). Specifically, Conemaugh argues that Ironshore's Known Claims and Circumstances claim should be estopped because (1) Conemaugh faces material prejudice from "Ironshore's reckless delay in its denial of coverage" and (2) Conemaugh relied on Ironshore's coverage and was "deprived of an opportunity to investigate and defend against Ironshore's contentions between 2015 to 2018." (*Id.*).

Ironshore asserts that its claim should not be estopped because (1) whether Ironshore issued a reservations of rights letter does not preclude Ironshore from asserting its claim because Ironshore is an excess insurer with no duty to defend Conemaugh, (2) even if Ironshore was required to issue a reservation of rights letter, Conemaugh cannot establish the elements necessary to merit estoppel of Ironshore's claim, and (3) the doctrine of waiver is not applicable to the Ironshore Policy. (ECF No. 217 at 8-11).

**B. Ironshore is Not Estopped from Bringing its Claim that Conemaugh Breached the Known Claims and Circumstances Clause**

The Court has diversity jurisdiction over this case. 28 U.S.C. §§ 1332, 1367 and FED. R. CIV. P. 14. Sitting in diversity, the Court applies Pennsylvania law. *See Erie RR. Co. v. Tompkins,* 304 U.S. 64, 78 (1938).

Under Pennsylvania law, "[e]quitable estoppel is a doctrine of fundamental fairness intended to preclude a party from depriving another of a reasonable expectation, when the party inducing the expectation knew or should have known that the other would rely to his detriment upon that conduct." *Nationwide Property and Casualty Insurance Co. v. Shearer,* 650 F. App'x 115, 117-118 (3d Cir. 2016) (quoting *TIG Ins. Co. v. Tyco Int'l Ltd.,* 919 F. Supp. 2d 439, 456 (M.D. Pa. 2013)). To establish estoppel in the insurance context, "there must be such conduct on the part of the insurer as would, if the insurer were not estopped, operate as a fraud on some party who has taken or neglected to take some action to his own prejudice in reliance thereon." *Shearer,* 650 F. App'x 115, 117-118 (quoting *Wasilko v. Home Mut. Cas. Co.,* 232 A.2d 60, 63 (Pa. Super. Ct. 1967)). "Accordingly, an insured must show '(1) an inducement, whether by act, representation, or silence when one ought to speak, that causes one to believe the existence of certain facts; (2) justifiable reliance on that inducement; and (3) prejudice to the one who relies if the inducer is permitted to deny the existence of such facts.'" *Shearer,* 650 F. App'x 115, 117-118 (quoting *TIG Ins. Co.,* 919 F. Supp. 2d at 456–57). Each of these elements must be established "by 'clear, precise and unequivocal evidence.'" *Nationwide Property and Cas. Ins. Co. v. Shearer,* 2015 WL 1186008 at *8  (W.D. Pa. Mar. 13, 2015) (citing *Chemical Bank v. Dippolito,* 897 F. Supp. 221, 224 (E.D. Pa. 1995)).

Conemaugh's arguments for estoppel fail on several fronts.  First, Conemaugh argues it was wrongly induced to rely on Ironshore's coverage because Ironshore never issued a "denial letter or reservation or rights letter" prior to the *Harker* verdict. (ECF No. 194 at 15-17).  In furtherance of this argument, Conemaugh relies on a series of cases finding that insurers were estopped from denying coverage because the insurer failed to timely issue a reservation of rights letter that fairly informed the insured of its position. (*Id.*). *See Wesport Ins. Corp. v. McClellan,* 493 F. Supp. 3d 315, 326 (E.D. Pa. 2020) (finding "actual prejudice occurs when an insurer assumes the insured's defense without timely issuing a reservation of rights letter asserting all possible bases for a potential denial of coverage"); *Beckwith Mach. Co. v. Travelers Indem. Co.* 638 F. Supp. 1179, 1187 (W.D. Pa. 1986) (finding that "[i]t is hornbook law that if an insurer assumes the insured's defense without sending the insured a reservation of rights letter or bringing a declaratory relief action, the insurer will later be precluded from denying coverage"); *Aetna Life and Casualty Co. v. McCabe,* 556 F. Supp. 1342, 1354-1355 (E.D. Pa. 1983) (finding that neither the requirement of timeliness nor adequate notice was given to the insured by an insurer with a duty to defend when the insurer waited until three days prior to the original trial date to attempt to disclaim coverage); *Selective Way Ins. Co. v. MAK Servs., Inc.,* 232 A.3d 762, 769 (Pa. Super. 2020) (finding that there is "presumptive prejudice" where an insurer's reservation of rights letter fails to "clearly communicate" the extent of the rights being reserved by an insurer assuming the defense of the insured).

However, none of the cases cited by Conemaugh are on point to the present case.  The cases presented by Conemaugh involve disputes between primary insurers and insureds where (1) the primary insurer had a duty to defend the insured, or (2) the primary insurer assumed the

defense of the insured. *See McClellan*, 493 F. Supp. 3d at 326; *Beckwith Mach. Co.*, 638 F. Supp. at 1187; *McCabe*, 556 F. Supp. at 1354-1355; *MAK Servs., Inc.*, 232 A.3d at 769.  Here, Ironshore is a second-layer excess insurer with no duty to defend Conemaugh. *Compare* ECF No. 192 at Exhibit D-1, ProSelect Primary HPL, Policy No. 2-25167HPL § IV(1) *with* ECF No. 192 at Exhibit D-4, Ironshore Policy § VII(B).  Ironshore does not have the same insurance relationship or duties to Conemaugh under the Ironshore Policy as the insurers had with their insureds in the cases cited by Conemaugh. Therefore, the Court will not apply the cases cited by Conemaugh to the present case.

   The Court next turns to Conemaugh's argument that Ironshore should be estopped from bringing its coverage defense claims because it "never issued a denial letter or a reservation of rights letter prior to verdict." (ECF No. 194 at 16).  Here, the Court finds that Ironshore's alleged failure to issue a reservation of rights letter prior to the *Harker* verdict is not dispositive of whether Ironshore should be estopped from bringing its coverage defense claims.  Indeed, more recent developments in the Middle District of Pennsylvania have found that where no contractual duty to defend exists under an excess insurer's policy, the excess insurer is under no obligation to issue a reservation or rights letter and will not be estopped from later asserting coverage defenses.  *See TIG Ins. Co. v. Tyco Intern. Ltd.*, 919 F. Supp. 2d 439, 458 (M.D. Pa. 2013) (finding that "an excess insurer that has no duty to investigate coverage issues or to defend its insured will not be estopped from later asserting coverage defenses by a failure to issue a reservation of rights letter") (quoting *Montgomery Ward & Co., Inc. v. Home Ins. Co.*, 753 N.E.2d 999, 1006 (Ill. App. Ct. 2001)).  The Court finds *Tyco's* findings and analysis both persuasive and applicable to the present the case.  Because the record is clear that Ironshore is a second-layer

excess insurer with no duty to defend Conemaugh, *compare* ECF No. 192 at Exhibit D-1, ProSelect Primary HPL, Policy No. 2-25167HPL § IV(1) *with* ECF No. 192 at Exhibit D-4, Ironshore Policy § VII(B), Ironshore is under no obligation to issue a reservation of rights letter and will not be estopped from asserting coverage defenses because it failed to issue a reservation of rights letter. 919 F. Supp. 2d at 458. Therefore, Conemaugh cannot show that Ironshore's alleged failure to issue a reservation of rights letter induced Conemaugh to rely on Ironshore's coverage.

Notwithstanding the Court's finding that Ironshore is not estopped from bringing its coverage defense claims for failing to issue a timely reservation of rights letter, the Court will now consider Conemaugh's arguments that Ironshore should be estopped from bringing its claims because Ironshore failed to timely issue a reservation of rights letter. First, assuming Ironshore failed to issue a reservation of rights letter until the day of the *Harker* verdict, Conemaugh has not demonstrated by "clear, precise and unequivocal evidence" that it was induced to rely on Ironshore's coverage before Ironshore sent a reservation of rights letter. *Shearer*, 2015 WL 1186008 at *8. For clarity, the Court notes that the *Harker* Plaintiffs' $15 million demand, the $47 million jury verdict, and Ironshore sending Conemaugh a reservation of rights letter, as alleged by Conemaugh, all occurred on March 22, 2018. (*See* ECF Nos. 200 at Exhibit D-33; 206-50 at Exhibit 49; *Harker*, ECF No. 72 at Exhibit D-22). However, nothing in the factual records demonstrates that Conemaugh knew, with any degree of certainty, that the Ironshore Policy would be impacted before March 22, 2018.[15] Indeed, Conemaugh cannot plausibly argue

---

[15] *See e.g.*, ECF Nos. 193 at Exhibit D-18 (Sosnowski's May 22, 2017 letter to Small and Weinzierl indicating Guerrini's belief that the *Harker* Case was worth more than $14 million to which Sosnowski stated he was "quietly taken back" because the $14 million case he referenced involved a child with cerebral palsy); ECF

that it was induced to rely on Ironshore's coverage prior to Ironshore sending a reservation of

rights letter on March 22, 2018, because Conemaugh received Ironshore's reservation of rights

letter on the same day Conemaugh knew the Ironshore Policy would definitively be impacted

by the *Harker* Case. (*Id.*).  Here, the Court finds that Conemaugh has failed to demonstrate by

"clear, precise and unequivocal evidence" that Ironshore induced Conemaugh to rely on its

coverage prior to Ironshore sending a reservation of rights letter.

With respect to the second prong, assuming Conemaugh could establish that Ironshore

induced Conemaugh, Conemaugh has failed to demonstrate how its reliance on Ironshore's

alleged inducement was reasonable. Conemaugh argues it was reasonable to rely on Ironshore's

silence that it would pay the *Harker* Settlement under the terms of the Ironshore Policy because

it never received a reservation of rights letter until the day of the *Harker* verdict.  (ECF No. 194

at 16-17).  Conversely, Ironshore maintains that it was unreasonable for Conemaugh to rely on

Ironshore's "silence" because Ironshore repeatedly reserved rights both at law and under the

Ironshore Policy beginning on the day it sent the Acknowledgement Letter. (*See* ECF Nos. 198 at

Exhibit D-12; 199 at Exhibit D-25; 206-50 at Exhibit 49; 189-6 at Exhibit 55; 189-8 at Exhibit 57).

Here, the Court finds that Conemaugh has failed to demonstrate by "clear, precise and

unequivocal evidence"  that its reliance on Ironshore was reasonable because Conemaugh was

---

No. 199 at Exhibit D-20 (Scott's February 1, 2018, email to Niessing recounting her call with Weinzierl in which Scott stated that Weinzierl informed her the *Harker* Case may "possibly" hit Ironshore's layer); ECF No. 199 at Exhibit D-22 (Sosnowski's February 5, 2018 email to Weinzierl containing a status report on the *Harker* Case stating Sosnowski's belief that the verdict range was between $2,500,000 and $10,000,000 with $10,000,000 being an "extreme figure"); ECF No. 200 at Exhibit D-33 (Harris's March 22, 2018, email to Weinzierl stating that "Plaintiffs' counsel ha[d] refused to negotiate until this morning when he advised his clients' rock bottom, non-negotiable demand is $15M"); and *Harker*, ECF No. 72 at Exhibit D-22 (March 22, 2018, *Harker* jury verdict slip finding over $47 million worth of damages owed to the *Harker* Plaintiff's).

put on notice—at least twice before the *Harker* verdict—that Ironshore had reserved rights under the Ironshore Policy.

Lastly, Conemaugh argues that it experienced prejudice because it relied on Ironshore's coverage and was "deprived an opportunity to investigate and defend against Ironshore's contentions between 2015 to 2018." (ECF No. 194 at 16). By way of example, Conemaugh argues that had Conemaugh timely received a reservation of rights letter, Conemaugh could have retained independent counsel to "advise on Ironshore's instruction to issue a bad faith letter to Coverys but not to Ironshore prior to trial." (*Id.* at fn. 6). Even assuming Ironshore was under an obligation to issue a reservation of rights letter, Conemaugh has failed to demonstrate by "clear, precise, and unequivocal evidence" that it was prejudiced by Ironshore failing to issue a reservation of rights letter before the *Harker* verdict. Indeed, evidence "by way of example" is not sufficient to meet the exacting standard required to merit equitable estoppel. Here, the Court finds that Conemaugh has not met its burden to demonstrate prejudice.

Given the foregoing, the Court finds that Ironshore is not estopped from bringing its claim against Conemaugh for breaching of the Known Claims and Circumstances Clause.

### C. Ironshore Has Not Waived its Coverage Defense Claims

With respect to the doctrine of waiver, "[i]n order to establish a waiver, the evidence must show that acts of the insurance company constituted a voluntary, intentional relinquishment of a known right and the insurer had full knowledge of all pertinent facts." *Wasilko,* 232 A.2d at 63. Furthermore, as the Pennsylvania Supreme Court has explained, "[t]he doctrine of implied waiver is not available to bring within the coverage of an insurance policy, risks that are expressly excluded therefrom." *Wasilko v. Home Mut. Cas. Co.,* 232 A.2d 60, 63 (Pa.1967).

Conemaugh contends that Ironshore waived its Known Claims and Circumstances Clause claim. However, Conemaugh has not produced any record evidence to suggest that Ironshore's actions throughout the *Harker* Case constituted a voluntary, intentional relinquishment of a known right. *Wasilko*, 232 A.2d at 63. Further, looking at the language of the ProSelect Primary Policy to which the Ironshore Policy follows form, the policy specifically excludes, "DAMAGES, INCIDENTS, CLAIMS, SUITS, or LICENSING PROCEEDINGS… that were known or reasonably should have been known by [Conemaugh]." (ECF No. 192 at D-1 ProSelect Primary HPL, Policy No. 2-25167HPL § IV (10)(b)(iii)). The risks expressly excluded from the ProSelect Primary Policy are the very risks that Conemaugh is now alleging Ironshore impliedly waived. Pennsylvania law does not permit Conemaugh to bring within the coverage of the ProSelect Primary Policy, those risks that were expressly excluded under the policy. *Wasilko*, 232 A.2d at 63. Here, the Court finds that Ironshore has not waived its rights under the ProSelect Primary Policy to bring a claim against Conemaugh for breaching the Known Claims and Circumstances Clause.

ii.  **There is a Genuine Issue of Material Fact Whether Conemaugh Breached the Election and Cooperation Clause**

A.  **The Parties' Arguments**

Conemaugh next argues that it did not breach the Election and Cooperation Clause because (1) Ironshore did not "elect to associate" in the investigation, settlement or defense of the *Harker* Case until, at least, February 2, 2018, (2) Conemaugh made available all information and records Ironshore requested, (3) Conemaugh cooperated with all of Ironshore's requests for

information, and (4) Ironshore cannot prove its alleged damages or prejudice was caused by Conemaugh. (ECF No. 194 at 19-28).

Ironshore asserts that Conemaugh breached the Election and Cooperation Clause because (1) the record evidence clearly demonstrates that Conemaugh failed to inform Ironshore of significant events throughout the *Harker* Case after it elected to associate, (2) Ironshore was denied the opportunity to participate in effectuating a settlement with the *Harker* Plaintiffs, and (3) Ironshore was prejudiced by Conemaugh's failure to inform Ironshore about the date trial date, the seriousness of the *Harker* Case, and Conemaugh's complete lack of liability defenses. (ECF No. 217 at 17-24).

### B. A Reasonable Jury Could Find Conemaugh Breached the Election and Cooperation Clause

Stated again, the Election and Cooperation Clause of the Ironshore Policy provides that:

> [Ironshore] may, at its sole discretion, elect to associate in the investigation, settlement, or defense of any claim against [Conemaugh], even if the Underlying [Coverage Amount] has not been exhausted. If [Ironshore] so elects, [Conemaugh] will cooperate with [Ironshore] and will make available all such information and records as [Ironshore] may reasonably require.

(ECF No. 196 at Exhibit D-4, Ironshore Policy § VII(B)). Under Pennsylvania law, courts interpret unambiguous writings as a matter of law, while ambiguous writings are interpreted by the finder of fact. *First Guard Ins. Co. v. Bloom Servs., Inc.*, No. 3:15-59, 2018 WL 949224, at *4 (W.D. Pa. Feb. 6, 2018); *Kripp v. Kripp*, 849 A.2d 1159, 1163-64 (Pa. 2004). When the language of an insurance policy is clear and unambiguous, courts must give effect to the policy's language. *401 Fourth St., Inc. v. Inv'rs Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005) (citing *Gene & Harvey Builders, Inc. v. Pennsylvania Manufacturers' Association Ins. Co.*, 517 A.2d 910, 913 (1986)). Here, the Court

finds that the Election and Cooperation Clause is clear and unambiguous and gives effect to the policy's language.

Further, Pennsylvania courts have found that "[a]lthough a breach of a duty to cooperate will relieve the insurer from liability under the policy, a failure to cooperate must be substantial and will only serve as a defense where the insurer has suffered prejudice because of the breach." *Forest City Grant Liberty Assocs. v. Genro II, Inc.*, 652 A.2d 948, 951 (Pa. Super. Ct. 1995). The finding of a "material breach of an insured's duty to cooperate is a question for the finder of fact." *Stonington Insurance Company v. Quarles*, 2009 WL 10684922 at *2 (E.D. Pa. June 25, 2009) (quoting *Genro II*, A.2d at 951); *see also Cameron v Berger*, 7 A.2d 293, 296 (Pa. 1938) (reiterating that the court is "not unmindful of the rule that where an insurer seeks to avoid liability for a lack of co-operation, the question whether there has been a material breach of the condition is ordinarily for the jury"). However, where a court finds that "the insurer has not put forth sufficient evidence to sustain its burden to demonstrate that the insured's alleged acts of non-cooperation were material to the insurer, the court may grant summary judgment for the insured." *Resource America, Inc. V. Certain Underwriting Members of Lloyd's Subscribing to Policy No. 501/FT98AAAF*, 2004 WL 2580554 at * 2-3 (Phila. Com. Pl. Nov. 12, 2004).

Here, the Court finds that there is a genuine issue of material fact with respect to (1) when Ironshore elected to associate in the *Harker* Case and (2) whether Conemaugh breached its obligation to cooperate under the Ironshore Policy. Additionally, the Court reserves to the finder of fact whether Conemaugh's alleged breach of the Election and Cooperation Clause was material.

First, Conemaugh asserts that Ironshore "affirmatively opted to **not** associate on the *Harker* Action claim from the time that Ironshore received the complaint in 2015 until, at the least, the two months preceding trial, and informed its policyholders of this election not to participate." (ECF No. 194 at 19) (emphasis included). In support of its position, Conemaugh highlights (1) Ironshore's slow response to Ulatsky's June 15, 2017, email informing Ironshore that the *Harker* Case had been reported to Ironshore's excess, (2) Ironshore failing to open a file and monitor the *Harker* Case until February 2, 2018, and (3) Ironshore's internal communications stating it was only "monitoring" the *Harker* Case. (ECF No. 194 at 19-22). In response, Ironshore argues that it affirmatively elected to associate in the *Harker* Case by (1) requesting that Conemaugh inform Ironshore if it intended to proceed to trial, (2) requesting that Conemaugh inform Ironshore of any upcoming trial dates, and (3) requesting that defense counsel include Ironshore on all significant correspondence. (ECF No. 217 at 18).

Here, the Court finds that there is a genuine issue of material fact with respect to when Ironshore elected to associate in the *Harker* Case. A reasonable jury could find that Ironshore affirmatively elected to associate in the *Harker* Case on any of several occasions. For example, at the earliest, a reasonable jury could find that Ironshore elected to associate when it sent the Acknowledgement Letter to Conemaugh on November 6, 2015, because Ironshore asked to be kept apprised of whether a settlement demand was made in excess of Ironshore's policy, whether Conemaugh intended to proceed to trial, or if Conemaugh otherwise determined that Ironshore's Policy may be impacted. (ECF No. 198 at Exhibit D-12). Similarly, a reasonable jury could find that Ironshore did not elect to associate until February 2, 2018, as alleged by Conemaugh, because Ironshore did not set up a file to monitor the *Harker* Case until that time.

(ECF No. 194 at 19).   Given the arguments and factual record before the Court, the Court finds

that there is a genuine issue of material fact as to when Ironshore elected to associate in the

*Harker* Case.

Second, with respect to whether Conemaugh breached its obligation to cooperate under

the Election and Cooperation Clause, Conemaugh argues it complied with its obligations under

the Election and Cooperation Clause because Conemaugh satisfied all of Ironshore's requests

for information. (ECF No. 194 at 22-26).   Further, Conemaugh argues that it (1) provided

Ironshore with *Harker* Case information it had available at the time Ironshore requested it, (2)

Conemaugh provided Ironshore with a "detailed" *Harker* Report upon request, and (3)

Conemaugh informed Ironshore that its layer may "possibly" be impacted before trial. (*Id.*).   In

response, Ironshore asserts that, (1) despite several requests for a trial date, Conemaugh never

provided Ironshore with a trial date until day three of the *Harker* trial, (2) Conemaugh never

copied Ironshore on significant correspondence involving the *Harker* Case as requested, and (3)

the Election and Cooperation Clause entitled Ironshore to all information it may "reasonably

require," not just information it may request. (ECF No. 217 at 17-21).

The Court finds that a reasonable jury could find that Conemaugh's failure to provide

Ironshore with a trial date, as well as Conemaugh's failure to copy Ironshore on all significant

correspondence, was a breach of Conemaugh's obligations under the Ironshore Policy.   Indeed,

even assuming Conemaugh's narrow interpretation of the Election and Cooperation Clause—

that Ironshore must affirmatively request information after it elected to associate on February 2,

2018— a reasonable jury could find that Conemaugh breached its obligation to cooperate by (1)

failing to provide the *Harker* trial date in response to Niessing's February 2, 2018 email, and (2)

failing to copy Tatlock on "significant correspondence" after he requested to be included on such correspondence in his February 13, 2018 email.  Here, the Court finds a genuine issue of material fact with respect to whether Conemaugh breached its obligations to cooperate under the Election and Cooperation Clause.

Finally, Conemaugh argues that "Ironshore cannot point to evidence showing an earlier association in the *Harker* Action would have met any success in defending or settling the [*Harker* Case]." (ECF No. 194 at 26).  In response, Ironshore argues that (1) whether an insurer experienced prejudice is ordinarily a question left for the jury and (2) the facts of record "clearly support the conclusion that Conemaugh's failure to inform Ironshore about the trial date prejudiced Ironshore." (ECF No. 217 at 22).

The Court finds that whether Conemaugh's alleged breach of the Election and Cooperation Clause was a material breach resulting in prejudice to Ironshore is a question best reserved to the finder of fact.  Ironshore has produced sufficient evidence to survive summary judgment by showing that Conemaugh's alleged breach of the Election and Cooperation Clause was material and that Conemaugh's alleged material breach resulted in prejudice to Ironshore. (ECF No. 219-3 at ¶ 35).  Specifically, Ironshore has produced evidence showing that Ironshore's late "emergence" in the *Harker* Case potentially prevented Ironshore from settling the *Harker* Case below the *Harker* Plaintiffs' $15 million demand and before a verdict was rendered. (*Id.*).  Therefore, the Court reserves the question of whether Conemaugh's alleged breach of the Election and Cooperation Clause was material and resulted in prejudice to Ironshore for the finder of fact. *Berger*, 7 A.2d at 296.

Given the foregoing analysis, the Court finds there is a genuine issue of material fact with respect to whether Conemaugh breached the Election and Cooperation Clause of the Ironshore Policy.  Therefore, Conemaugh's motion for summary judgment is denied.

### iii.   There is a Genuine Issue of Material Fact Whether Conemaugh Breached the Known Claims and Circumstances Clause

#### A.   The Parties' Arguments

Conemaugh argues that it did not breach the Known Claims and Circumstances Clause as alleged by Ironshore.  Specifically, Conemaugh argues that it had no subjective knowledge that GH's treatment would lead to a claim brought under the Ironshore Policy because (1) the result of GH's treatment was reported as an "incident" and not a "serious event" under MCARE, (2) Conemaugh received no notice whatsoever of any issues relating to GH's treatment, (3) GH's parents returned to have their second child at Conemaugh, and (4) Dr. Chan reported a pleasant exchange with GH's father in the hospital around the time the Harker's second child was born at Conemaugh. (ECF No. 194 at 29-30).

In response, Ironshore alleges that Conemaugh has failed to produce any evidence that sufficiently demonstrates the absence of a genuine issue of material fact as to whether Conemaugh breached the Known Claims and Circumstance Clause. (ECF No. 217 at 26). Rather, Ironshore argues, "Conemaugh simply selects portions of deposition testimony, and from those, asks the Court to draw inferences *in a light most favorable to it.*" (*Id.*) (emphasis included).  Further, Ironshore argues that even if Conemaugh has produced sufficient evidence to establish the absence of a genuine issue of material fact, Ironshore has satisfied its burden to "set forth 'specific facts showing that there is a *genuine issue for trial.*'" (*Id.* at 28) (emphasis

included) (quoting *Matsushita Elec. Corp. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting

Fed. R. Civ. P. 56(e))).

**B.  There is a Genuine Issue of Material Fact with Respect to Ironshore's Subjective Knowledge of Relevant Facts at the Time it Applied for the Ironshore Policy**

Stated again, the ProSelect Primary HPL, Policy No. 2-25167HPL, to which the Ironshore

Policy follows form, contains the Known Claims and Circumstances Clause stating:

> This POLICY does not apply to any liability of [Conemaugh] or to any DAMAGES, INCIDENTS, CLAIMS, SUITS, or LICENSING PROCEEDINGS:
> … That was not disclosed to US in the POLICY APPLICATION or in any application submitted to US for prior acts or retroactive coverage and the INSURED or the NAMED INSURED knew or should have known that such INCIDENT, circumstance or situation had the potential to give rise to a CLAIM covered by this POLICY.

(ECF No. 196 at Exhibit D-1, ProSelect Primary HPL Policy § VI(10)(b)(iii)).

Under Pennsylvania law, courts interpret unambiguous writings as a matter of law, while ambiguous writings are interpreted by the finder of fact. *First Guard Ins. Co. v. Bloom Servs., Inc.*, No. 3:15-59, 2018 WL 949224, at *4 (W.D. Pa. Feb. 6, 2018); *Kripp v. Kripp*, 849 A.2d 1159, 1163-64 (Pa. 2004). When the language of an insurance policy is clear and unambiguous, courts must give effect to the policy's language. *401 Fourth St., Inc. v. Inv'rs Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005) (citing *Gene & Harvey Builders, Inc. v. Pennsylvania Manufacturers' Association Ins. Co.*, 517 A.2d 910, 913 (1986)). Here, the Court finds that the Primary Policy's Known Circumstances and Claims provision, to which the Ironshore Policy follows form, is unambiguous.

When analyzing professional liability insurance policies containing clauses similar to the Known Claims and Circumstances Clause, the Third Circuit applies a mixed

subjective/objective test to determine whether an insured's prior knowledge bars coverage under the policy. *Selko v. Home Ins. Co.*, 139 F.3d 146 (3d Cir. 1998).[16] In *Selko*, the court explained:

> First it must be shown that the insured knew of certain facts. Second, in order to determine whether the knowledge actually possessed by the insured was sufficient to create a 'basis to believe,' it must be determined that a reasonable [insured] in possession of such facts would have had a basis to believe that the insured had breached a professional duty.

*Id.* at 152 (quoted by *Foster v. Westchester Fire Ins. Co.*, 2011 WL 4382971 at *9 (W.D. Pa. Sept. 20, 2011). "This test is both subjective and objective in nature." *Coregis Ins. Co. v. City of Harrisburg*, 2005 WL 2179734 at *7 (M.D. Pa. Sept. 9, 2005). "The first part of the test requires the court to determine the insured's subjective knowledge of then-existing facts; the second part of the test requires the court to determine, objectively, what a reasonable [insured] possess[ing]… the same knowledge would have concluded based upon the then-existing knowledge. *Foster*, 2011 WL 4382971, at *9 (citing *Coregis Ins. Co.*, 2005 WL 2179734 at *7). The burden is on the insurer, "to prove what particular facts were known to the insured, and that based upon such facts, a reasonable [insured] in the same position would have concluded that liability was possible. *Selko*, 139 F.3d at 152.

---

[16] Although the *Selko* test was first applied to professional liability insurance policies for attorneys, the Third Circuit and Pennsylvania courts have applied the *Selko* test to other professional liability insurance policies including real estate brokers, *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231 (3d Cir. 2006), professional investment advisors, *MDL Capital Management, Inc. v. Federal Ins. Co.*, 2008 WL 2944890 (W.D. Pa. July 25, 2008), and public officials, *Coregis Ins. Co. v. City of Harrisburg*, 2005 WL 2179734 (M.D. Pa. September 9, 2005). Given that the Ironshore Policy follows form to the ProSelect "Health Care Facility Professional Liability" policy, *see* ECF No. 178-2 at 2, the Court finds that the *Selko* test is applicable to the professional liability insurance policy in this case.

In applying *Selko*, the Court must first analyze Conemaugh's subjective knowledge of relevant facts at the time it applied for the Ironshore Policy. In its brief, Conemaugh alleges that it subjectively knew (1) GH was born prematurely on ███████████, (2) GH had swelling on her head, (3) after ordering and reviewing a CT scan, Dr. Chan diagnosed GH with a subgaleal hemorrhage, (4) Dr. Chan prescribed that a wrap be placed around GH's head to reduce swelling, (5) when the wrap was removed from GH's head, necrosis had developed on GH's scalp and she experienced hair loss, (6) GH was transferred to Houston via medical air flight to return home to Texas, (7) GH's treatment was reported under MCARE as an "incident" and not as a "serious event," (8) Conemaugh received no communications from any person relating to any issues surrounding GH's treatment, (9) GH's parents had their second child at the same hospital that they delivered GH, and (10) Dr. Chan reported a pleasant exchange with GH's father. (ECF No. 194 at 29-30).

In analyzing Conemaugh's subjective knowledge at the time of its application for insurance, the Court finds several issues of fact that cannot be resolved at this stage of litigation. For example, the Court finds there is a genuine issue of material fact with respect to what Conemaugh subjectively knew with respect to GH's medical air flight. Conemaugh maintains that GH's transfer via air flight to Texas Children's Hospital in Houston, Texas was "not unusual or indicative of a serious injury" but was "the standard of care for premature infants being transported across state lines." (*Id.*). Ironshore rejects this argument strenuously, pointing to Dr. Chan's testimony stating medical air flight would be appropriate "if you were transporting a possibly sick child that could deteriorate..." (ECF No. 217 at 27). Further, Ironshore argues that GH's "medical record, coupled with the air ambulance transfer, rather

than a commercial or chartered flight, indicates this child ha[d] ongoing medical issues..." (*Id.*).
Given the conflicting arguments and evidence regarding what Conemaugh subjectively knew
when GH was transported via medical air flight, the Court cannot, as a matter of law, make a
finding as to what Conemaugh subjectively knew at the time GH was transferred to Texas.
Indeed, if a reasonable jury were to believe Conemaugh's purported subjective knowledge—
that it was fairly routine to use medical air flights for premature born children— the jury could
also find that it would be unreasonable for Conemaugh to report such an ordinary occurrence
on an insurance application.   Conversely, if a reasonable jury were to believe Ironshore that
Conemaugh subjectively knew that the use of medical air flights was an irregular occurrence for
premature born children and was only used in severe circumstances, then similarly, a jury
could find it would be reasonable for Conemaugh to have reported the incident on the
insurance application.  Given the foregoing, the Court finds there is a genuine issue of material
fact with respect to what Conemaugh subjectively knew at the time GH was transferred via
medical air flight from Conemaugh to Texas.[17]

Given that the Court has found genuine issues of material fact that call into question
Conemaugh's subjective knowledge of relevant facts at the time it applied for Ironshore Policy,
the Court need not discuss the objective prong of the *Selko* test. Therefore, the Court finds that

---

[17] This is one example of a genuine issue of material fact the Court finds with respect to Conemaugh's
subjective knowledge at the time it applied for the Ironshore Policy.  Other examples include, but are not
limited to, what Conemaugh's investigation revealed about the causes of GH's injuries, the severity of
GH's injuries, and how much treatment GH would require to recover from her injuries.  Indeed, many of
the genuine issues of fact stem from the thoroughness of the investigation undertaken by Conemaugh
after the *Harker* Incident occurred. At this stage in the litigation, the Court is not in a position to make the
necessary findings of relevant facts to establish what Conemaugh subjectively knew about the *Harker*
Case at the time it applied for the Ironshore Policy.

Conemaugh is not entitled to summary judgment with respect to Ironshore's claims that Conemaugh breached the Known Claims and Circumstances Clause.

### iv. Ironshore is Not Prevented from Seeking Recoupment Under a Theory of Unjust Enrichment

#### A. The Parties' Arguments

Conemaugh argues that Ironshore is not entitled to recoupment under a theory of unjust enrichment because Conemaugh was not unjustly enriched. Conemaugh argues it has not been unjustly enriched by Ironshore because Ironshore was "merely conditionally paying [the *Harker* Settlement] pursuant to the excess insurance policy which the parties prior unconditionally contracted for." (ECF No. 194 at 31). In response, Ironshore contends that Conemaugh has not satisfied its burden to demonstrate there is no genuine issue of material fact to support the Court granting summary judgment in Conemaugh's favor, and that Ironshore is entitled to bring its claim for unjust enrichment under Pennsylvania law. (ECF No. 217 at 32).

#### B. Ironshore May Seek Recoupment Under a Theory of Unjust Enrichment

Under Pennsylvania law, unjust enrichment is an equitable doctrine that requires the defendant to pay to the plaintiff the value of the benefit conferred. *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super. 1999) (citing *Schenck v. K.E. David, Ltd.* 666 A.2d 327 (Pa. Super. 1995)). To prove unjust enrichment, the plaintiff must show:

> (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. The application of the doctrine depends on the particular factual circumstances of the case at issue. In determining if the doctrine applies, our focus is not on the intention of the parties, but rather whether the defendant has been unjustly enriched.

*Id.* (citing *Torchia v. Torchia*, 499 A.2d 581, 582 (Pa. Super. 1985)).

Previously, at the first motion to dismiss phase of this litigation, the Court reviewed and analyzed the parties' arguments with respect to whether recoupment, under a theory of unjust enrichment, was available to Ironshore where the Ironshore Policy did not expressly allow Ironshore to recoup payment on a covered claim. *Ironshore Specialty Insurance Company v. Conemaugh Health System, Inc.*, 2019 WL 1283976 at *9-*11 (W.D. Pa. Mar. 20, 2019). In the Court's opinion, after a lengthy review of the case law cited by both parties, the Court found that the authorities did not "clearly establish whether an excess insurer may recoup indemnity payments under state law." *Id.* Nevertheless, the Court found that "Ironshore plausibly allege[d] that it conferred a benefit on [Conemaugh] by paying indemnity on Conemaugh and Dr. Chan's behalf to settle *Harker v. Chan*." *Id.*

Now, the Court turns again to substantially similar arguments with respect to the legal standard applicable to Ironshore's claim for recoupment under a theory of unjust enrichment in the face of an express insurance contract. With the record now before the Court, and in reviewing the authorities cited by the parties, the Court not only finds *Axis Special Ins. Co. v. Brickman Group LTD, LLC* instructive, but highly persuasive. *See Conemaugh Health System, Inc.*, 2019 WL 1283976 at 11, fn. 10. Consistent with the Eastern District of Pennsylvania, the Court now adopts the *Brickman* court's holding that:

> [U]nder Pennsylvania law, an insurer who makes a settlement payment on its insured's behalf may assert an unjust enrichment claim for reimbursement if it is determined after the payment is made that the insurer was not obligated to make the payment under the terms of the insurance policy.

*Axis Special Ins. Co. v. Brickman Group LTD, LLC*, 756 F. Supp. 2d 644, 655 (E.D. Pa 2010).

As previously stated, Conemaugh argues that no material benefit has been conferred on it by Ironshore because Ironshore was "merely conditionally paying [the *Harker* Settlement] pursuant to the excess insurance policy which the parties prior unconditionally contracted for." (ECF No. 194 at 31). However, if Ironshore succeeds on either of its claims against Conemaugh, Ironshore would be entitled to recoupment of its settlement payment because Ironshore would have made a payment under the Ironshore Policy that Ironshore was not obligated to make. *Brickman Group LTD, LLC*, 756 F. Supp. 2d at 655. Given that there is a genuine issue of material fact as to whether Conemaugh breached the Ironshore Policy, the Court will not prevent Ironshore from asserting its arguments for recoupment under a theory of unjust enrichment at trial.

For the foregoing reasons, the Court denies Conemaugh's motion for summary judgment against Ironshore. (ECF No. 174). An appropriate order follows this memorandum opinion.

b.     **The Court Will Grant Ironshore's Partial Motion for Summary Judgment Against Conemaugh (ECF No. 173)**

Ironshore contends that its partial motion for summary judgment against Conemaugh should be granted because (i) Conemaugh cannot establish a bad faith claim against Ironshore under Section 8371, (ii) Conemaugh cannot establish a breach of contract claim, and (iii) Conemaugh cannot establish a claim for breach of the duty of good faith and fair dealing. (ECF No. 176).

Conemaugh argues in opposition that Ironshore's partial motion for summary judgment should be denied because (i) Ironshore clearly acted in bad faith to conceal its poor claims-

handling processes by suing Conemaugh, (ii) Ironshore breached the Ironshore Policy, and (iii) Ironshore's conduct amounts to a breach of the duty of good faith and fair dealing. (ECF No. 221).

     i.     **There is No Genuine Issue of Material Fact as to Whether Ironshore's Actions Constituted Bad Faith Pursuant 42 Pa. C.S.A. § 8371**

     A.   **The Parties' Arguments**

Ironshore argues that Conemaugh cannot establish a claim for bad faith under Section 8371 because (1) Ironshore's declaratory judgment against Conemaugh does not constitute statutory bad faith, (2) Ironshore did not refuse any payment under the Ironshore Policy, and (3) Conemaugh has not produced any evidence to demonstrate that Ironshore acted unreasonably. (ECF No. 176 at 23-37).

In response, Conemaugh contends it has clearly established a claim for bad faith under Section 8371 because (1) Section 8371 is intended to protect Conemaugh from conduct like Ironshore's conduct, (2) Ironshore is knowingly raising a false claim against Conemaugh with respect to whether Conemaugh should have disclosed the *Harker* Case as required under the Ironshore Policy, (3) Ironshore brought the present suit against Conemaugh to cover up its inadequate claims-handling practices, and (4) Ironshore believed it had no right to seek recoupment under the Ironshore Policy yet proceeded to sue Conemaugh anyway. (ECF No. 221 at 13-28).

     B.   **No Reasonable Jury Could Conclude That Ironshore's Actions Constituted Bad Faith Pursuant to Section 8371**

The Pennsylvania General Assembly enacted Section 8371 "to protect insureds from bad faith denial of coverage." *Berg v. Nationwide Mutual Ins. Co., Inc.*, 189 A.3d 1030, 1037 (Pa. Super.

Ct. 2018). "Bad faith applies to 'those actions an insurer took when called upon to perform its contractual obligations of defense and indemnification or payment of a loss that failed to satisfy the duty of good faith and fair dealing implied in the parties' insurance contract.'" *Id.* (quoting *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 199 (Pa. 2007)).

"To prevail upon a claim for bad faith under § 8371, a plaintiff must demonstrate by clear and convincing evidence, two elements: '(1) that the insurer had no reasonable basis for denying benefits under the policy and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim.'" *Berg v. Nationwide Mutual Insurance Company, Inc.*, 235 A.3d 1223, 1232 (Pa. 2020) (quoting *Rancosky v. Washington Nat'l Ins. Co.*, 170 A.3d 364, 376–77 (Pa. 2017) (adopting the two-part test articulated in *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680 (Pa. Super. Ct. 1994)). Ultimately, while an insured must prove a statutory bad faith claim by clear and convincing evidence, *Maronda Homes, LLC v. Motorists Mut. Ins. Co.*, 2:20-cv-01526-CCW, 2021 WL 2017337, at *3 (W.D. Pa. May 20, 2021), "'a reasonable basis is all that is required to defeat a claim of bad faith.'" *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 523 (3d Cir. 2012) (quoting *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 367 (3d Cir. 2004)).

Ironshore contends that Conemaugh cannot establish a claim for bad faith under Section 8371 because Ironshore did not deny Conemaugh benefits under the Ironshore Policy. (ECF No. 176 at 28). To be sure, neither party disputes that Ironshore indemnified Conemaugh when a settlement was reached with the *Harker* Plaintiffs. (ECF No. 222 at ¶ 76) (conceding Ironshore paid $5,928,158.10 at the time of settlement). However, as previously determined by the Court, simply paying an insurance claim is not sufficient to foreclose a claim for bad faith under Section 8371. *See Ironshore Specialty Ins. Co. v. Conemaugh Health Sys.*, 423 F. Supp. 3d 139, 154-

155 (W.D. Pa. Nov. 14, 2019), *reconsideration denied* 2020 WL 376994 (W.D. Pa. Jan. 22, 2020).

Indeed, as the Court previously found, "[p]ayment of [a] claim does not grant immunity from

bad faith." 423 F. Supp. 3d at 155 (citing *Barry v. Ohio Cas. Grp.*, No. 3:04-cv-188, 2007 WL

128878, at *11 (W.D. Pa Jan. 12, 2007). "Bad faith can also include poor claims-handling, the

insurer's failure to act with diligence to respond to the insured, scattershot investigation, and

similar conduct." 423 F. Supp. 3d at 155 (citing *Rancosky*, 170 A.3d at 379 (Wecht, J.,

concurring)). "Further, the use of litigation in bad faith to evade a duty that a policy requires

can give rise to claim under Section 8371." 423 F. Supp. 3d at 155 (citing *W.V. Realty, Inc. v. N.*

*Ins. Co.*, 334 F.3d 306, 313 (3d Cir. 2003)). In light of the Court's previous opinion, the Court

now turns to Conemaugh's arguments that Ironshore's claims-handling and current litigation

against Conemaugh constitute bad faith within the meaning of Section 8371.

Initially, Ironshore argues that Conemaugh has failed to establish a claim of bad faith

under Section 8371 with respect to Ironshore's claims-handling because Conemaugh has not

produced any evidence that Ironshore acted unreasonably. (ECF No. 176 at 30-35). In

furtherance of its argument that it acted reasonably, Ironshore recounts the factual record from

the time the *Harker* Complaint was filed to the date Ironshore alleges it was informed of the

*Harker* trial date. (*Id.*). In response, Conemaugh argues that it was denied the benefit of having

an insurer with adequate claims-handling processes. (ECF No. 221 at 13-19). Specifically,

Conemaugh alleges that Ironshore's claims-handling processes were inadequate because: (1)

Ironshore chose not to open a "live claim file" for the *Harker* Case until just before trial, (2)

Ironshore informed Conemaugh on November 6, 2015, that it did not view the *Harker* Case as

having the potential of triggering the Ironshore layer of coverage, (3) Ironshore reviewed the

*Harker* Case and stated it would not be monitored, (4) Ironshore took no action when the *Harker*

Case was reported to Lander when she asked for serious claims, (5) Ironshore valued the *Harker*

Case at less than the Ironshore Policy attachment point, and (6) Ironshore did not check the

docket nor did it contact attorney Sosnowski. (*Id.* at 13-33).

Here, the Court finds that Conemaugh has failed to show by clear and convincing

evidence that Ironshore lacked a reasonable basis for its claims-handling actions throughout the

*Harker* Case. Indeed, even if the Court construes all of Conemaugh's specific allegations of bad

faith claims-handling on the part of Ironshore as true, Ironshore has still demonstrated a

reasonable basis for its claims-handling actions. First, Conemaugh argues that Ironshore's

failing to open a "live claim file" for the *Harker* Case until just before trial was an act of bad

faith. (ECF No. 221 at 17). In response, Ironshore argues that it was not aware that the *Harker*

Case had the potential to reach Ironshore's layer until late January/early February 2018. (ECF

No. 176 at 32-33). Further, upon receiving the *Harker* Report on February 5, 2018, Ironshore was

led to believe the *Harker* Case would result in a verdict that would "top out at or near" $10

million. (*Id.*). Additionally, even after Ironshore was informed its layer was unlikely to be

reached, Ironshore set up a "live claim file" to monitor the *Harker* Case on February 6, 2018.

(*Id.*). Here, Ironshore has sufficiently demonstrated it had a reasonable basis for setting up a

"live claim file" when it did. The Court finds there was nothing unreasonable with respect to

Ironshore's claims-handling actions of setting up a "live claim file" until just before trial.

Conemaugh also argues it was unreasonable for Ironshore to value the *Harker* Case at

less than the Ironshore Policy attachment point of $12 million. (ECF No. 221 at 18-19).

However, as stated above, Brown received the *Harker* Report on February 5, 2018, in which

Sosnowski stated that the *Harker* verdict could "top out at or near $10,000,000," which Sosnowski considered to be an "extreme figure." (ECF No. 199 at Exhibit D-22). Conemaugh has not demonstrated by clear and convincing evidence that Brown lacked a reasonable basis for valuing the *Harker* Case at less than the Ironshore Policy $12 million attachment point. Indeed, it would be reasonable for Brown to value the *Harker* Case at less than the Ironshore attachment point because Sosnowski estimated an extreme verdict figure nearly $2 million below the Ironshore attachment point. Here, the Court finds that Ironshore's valuation of the *Harker* Case was reasonable and did not constitute bad faith under Section 8371.

Next, Conemaugh argues that Ironshore's claims-handling actions were taken in bad faith because (1) Lander stated that she reviewed the *Harker* Case and determined it would not be monitored, and (2) Lander took no action once Conemaugh reported the *Harker* Case as a "serious claim." (ECF No. 221 at 17-18). Here, the Court finds it was reasonable for Ironshore not to monitor the *Harker* Case as stated by Lander in January 2016. (ECF No. 198 at Exhibit D-13). At the time, Lander based her decision not to monitor the *Harker* Case on her finding that the *Harker* Case had "low exposure." (*Id.*). It was reasonable for Lander, after reviewing the *Harker* Case and finding low exposure, not to monitor the *Harker* Case.[18] Further, the Court finds Lander's inaction once the *Harker* Case was reported as a "serious claim" was also reasonable. Lander emailed Conemaugh requesting information about any serious cases and any trials scheduled in the next six months. (ECF No. 198 at Exhibit D-14). In response, Ulatsky emailed Lander that "[e]xpert views [were] unfavorable" with respect to the *Harker* Case. (*Id.*).

---

[18] The Court notes that the *Harker* Case was not completely unmonitored. The factual record indicates that the *Harker* Case was assigned to a bordereau file (HCL 00034679) and Conemaugh was to contact Scott if it had any questions about the *Harker* Case. (ECF No. 198 at Exhibit D-12).

Ulatsky provided no trial date in her email because no trial date had been set. (*Id.*). The Court finds Lander's inaction once the *Harker* Case was reported as a "serious claim" was reasonable because she had no reason to believe that a trial in the *Harker* Case would happen for at least six months. Here, the Court finds that Conemaugh has failed to show by clear and convincing evidence that Lander lacked a reasonable basis for her claims-handling actions.

Finally, the Court reviews whether Tatlock's claims-handling were unreasonable and constituted bad faith under Section 8371. Conemaugh was informed that Tatlock was assigned to the *Harker* Case on February 13, 2018. (ECF No. 199 at Exhibit D-25). Conemaugh alleges that Tatlock's claims-handling actions were taken in bad faith because he did not check the docket nor did he contact attorney Sosnowski once he received his contact information. (ECF No. 221 at 18-20). Here, the Court finds that Tatlock had a reasonable basis for not checking the *Harker* Case docket. Ironshore has demonstrated that it was reasonable for Tatlock not to check the *Harker* Case docket because checking the docket was not done in the "ordinary course of business." (ECF No. 206-5 at Exhibit 5, p. 10). Further, Ironshore has demonstrated that it was reasonable for Tatlock not to contact Sosnowski because some insureds preferred that excess insurers not contact defense counsel because it runs up legal fees. (ECF No. 180-4 at Exhibit 19, p. 81:9-83:11). Rather than contact defense counsel, Ironshore has demonstrated that it had a procedure of working with the insured first to "tailor how [Ironshore would] interact with defense counsel." (*Id.*). Here, the Court finds that Conemaugh has failed to show by clear and convincing evidence that Tatlock's claims-handling actions lacked a reasonable basis.

With the record before it, the Court finds that Conemaugh has failed to demonstrate by clear and convincing evidence that Ironshore lacked a reasonable basis for its claims-handling

actions. Therefore, Conemaugh has failed to establish that Ironshore's claims-handling actions constitute bad faith under Section 8371.

Second, Conemaugh argues that it was denied the benefit of not being sued in bad faith. (*Id.* at 19-29). Conemaugh argues Ironshore is suing Conemaugh in bad faith because (1) Ironshore is attempting to cover up its "flagrantly inadequate internal practices," (2) Ironshore has pled "insincere contentions" in its complaint, (3) Ironshore has brought its suit on a "knowingly false claim regarding an alleged failure to disclose" the *Harker* Case, and (4) Ironshore is suing for recoupment when Ironshore knows it has no such right under the Ironshore Policy. (ECF No. 221 at 7-29).

As with the claims-handling actions discussed above, the question of whether Ironshore's present lawsuit against Conemaugh constitutes bad faith under Section 8371 hinges on whether Ironshore had a "reasonable basis" for bringing its suit against Conemaugh. *Berg,* 235 A.3d at 1232. Here, the Court finds that Conemaugh has failed to show by clear and convincing evidence that Ironshore lacked a reasonable basis for bringing the instant suit against Conemaugh. First, as discussed above, the Court has found that Ironshore sufficiently demonstrated a reasonable basis for its claims-handling actions. *Supra.* Ironshore need not bring a suit to cover up its "flagrantly inadequate internal practices" when the Court has found Ironshore had a reasonable basis for its claims-handling practices. Second, the Court has also found that Ironshore's claims for (1) breach of the Known Claims and Circumstances Clause and (2) recoupment under a theory of unjust enrichment will survive summary judgment. *Supra* Section VI.a.i, iii-iv. Therefore, the Court finds that Conemaugh has failed to demonstrate by

clear and convincing evidence that Ironshore lacked a reasonable basis for bringing the instant

suit against Conemaugh.

With the record before it, the Court finds that Conemaugh has not produced sufficient

evidence to establish a genuine issue of material fact that Ironshore's actions constituted bad

faith pursuant to Section 8371. Indeed, the Court finds that no reasonable jury could conclude

that Ironshore's actions constituted bad faith pursuant to Section 8371. Therefore, the Court will

grant Ironshore's motion for summary judgment with respect to Conemaugh's Section 8371 bad

faith claim.

### ii. There is No Genuine Issue of Material Fact as to Whether Ironshore Breached the Ironshore Policy

#### A. The Parties' Arguments

Ironshore argues it is entitled to summary judgment as to Conemaugh's claim for breach

of contract because there is nothing in the factual record to support a finding of breach or

damages under the Ironshore Policy. (ECF No. 176 at 38). Specifically, Ironshore argues that (1)

Conemaugh acknowledges Ironshore paid its portion of the *Harker* Settlement, (2) Conemaugh

failed to identify any damages in discovery, and (3) Conemaugh's damages are too speculative

to support a claim for breach of contract. (*Id.* at 38-39).

Conemaugh contends that it has been damaged by Ironshore's breach of contract. (ECF

No. 221 at 29). Specifically, Conemaugh argues that it experienced damages because (1)

Conemaugh paid valuable consideration in the form of premiums for a benefit it was denied, (2)

Conemaugh incurred legal expenses, (3) Conemaugh was required to retain and pay insurance

consultants and experts, and (4) Conemaugh faced negative media coverage. (*Id.*). Lastly,

Conemaugh argues that, at a minimum, Conemaugh is entitled to nominal damages for breach of contract. (*Id.*).

**B.  No Reasonable Jury Could Find that Ironshore Breached the Ironshore Policy**

Under Pennsylvania law, "it is well-established that three elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and (3) resultant damages." *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (2016) (citing *J.F. Walker Co., Inc. v. Excalibur Oil Grp., Inc.*, 792 A.2d 1269, 1272 (Pa.Super.2002)). Contract damages must be proved "with reasonable certainty," which means that the damages cannot be "too speculative, vague, or contingent upon some unknown factor." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 226 (3d Cir. 2003) (applying Pennsylvania law). "Damages are speculative only if the uncertainty concerns the fact of damages rather than the amount." *Wachovia Bank, N.A. v. Ferretti*, 935 A.2d 656, 572 (Pa. Super. Ct. 2007).

At the motion to dismiss phase of this litigation, the Court found that Conemaugh had sufficiently pled that Ironshore, through the filing of this present lawsuit and seeking recoupment, had caused Conemaugh non-speculative damages. 2020 WL 376994 at *4 (W.D. Pa. Jan. 22, 2020). The Court based this finding on the fact that "[d]etermining the amount of damages is often not easy until the parties have undergone discovery." *Id.* Now, with the benefit of discovery, and the record before the Court, the Court finds that Conemaugh's claim for breach of contract fails as a matter of law.

First, the Court finds that Conemaugh has produced no record evidence that Ironshore breached its duties under the Ironshore Policy. Conemaugh's sole argument for breach is that

Ironshore made a "conditional place holder settlement payment…in an effort to mitigate its own damages and in the hopes of staving off a bad faith claim…" (ECF No. 221 at 29). As the record clearly reflects, Ironshore paid the portion of the *Harker* Settlement it was required to under the Ironshore Policy. (ECF No. 222 at ¶ 76) (conceding Ironshore paid $5,928,158.10 at the time of settlement). Regardless of the characterization Conemaugh ascribes to the intent behind Ironshore's payment, Ironshore fulfilled its duty to indemnify Conemaugh under the Ironshore Policy. Further, Conemaugh strenuously asserts that it was entitled to an "unconditional benefit" under the Ironshore Policy. (ECF No. 257-1 at ¶ 12). However, the Court notes that Conemaugh was never entitled to an "unconditional benefit" under the Ironshore Policy. Rather, Conemaugh was only entitled to a conditional benefit under the Ironshore Policy if it complied with the terms of the policy. Here, the Court finds that no reasonable jury could find that Ironshore breached the Ironshore Policy because Ironshore satisfied its obligations to indemnify Conemaugh under the Ironshore Policy.

Second, assuming Conemaugh could demonstrate that Ironshore breached the Ironshore Policy, Conemaugh alleges the following damages: (1) Conemaugh paid valuable consideration in the form of premiums for a benefit it was denied, (2) Conemaugh incurred legal expenses, (3) Conemaugh was required to retain and pay insurance consultants and experts, and (4) Conemaugh faced negative media coverage. (ECF No. 221 at 29). The Court can immediately dismiss Conemaugh's argument for damages due to negative media coverage because Conemaugh has not demonstrated, whatsoever, the damages it experienced as a result of negative media coverage. Next, as the Court previously stated, Conemaugh was not denied the benefit of Ironshore's indemnity payment at the time the *Harker* Case settled because Ironshore

indemnified Conemaugh under the Ironshore Policy. *Supra*.   Therefore, Conemaugh has experienced no damages under the Ironshore Policy with respect to its premium payments because Conemaugh received the benefit to which it was entitled under the terms of the Ironshore Policy.  Lastly, the Court turns to Ironshore's claims for litigation damages, *i.e.*, legal expenses and the retention of insurance consultants and experts. (ECF No. 221 at 29). With respect to attorneys' fees, Conemaugh would likely not be entitled to attorneys' fees under Pennsylvania law.[19] The only potential damages Conemaugh could claim are costs associated with this litigation.  *See Wells Fargo Bank, National Association v. Akanan*, 2021 WL5910422 at *5 (W.D. Pa. Dec. 14, 2021).  However, assuming Conemaugh would be entitled to costs as a result of the instant suit, the Court has already found that no reasonable jury could find that Ironshore breached the Ironshore Policy because Ironshore indemnified Conemaugh under the Ironshore Policy.  Therefore, the Court finds that Conemaugh's claim for breach of contract fails as a matter of law.

Finally, Conemaugh argues that, at a minimum, it is entitled to recover nominal damages for Ironshore's breach of contract. (ECF No. 221 at 29).  However, given the Court's

---

[19] Pennsylvania is an American Rule state. *Wells Fargo Bank, National Association v. Akanan*, 2021 WL 5910422 (W.D. Pa. Dec. 14, 2021). This means "a litigant cannot recover counsel fees from an adverse party unless there is express statutory authorization, a clear agreement of the parties, or some other established exception." *Langenberg v. Warren General Hospital*, 2013 WL 6147576, *12 (W.D. Pa. Nov. 22, 2013) (quoting *Sayler v. Skutches*, 40 A.3d 135, 140 (Pa. Super. Ct. 2012)).  No party has pointed to any provision in the Ironshore Policy that would permit Conemaugh to recover attorneys' fees in the event Conemaugh is successful in the present litigation.  Further, given the Court's finding that Conemaugh has failed to demonstrate bad faith on the part of Ironshore as a matter of law, *supra* Section VI.b.i.B, Conemaugh would not be entitled to attorneys' fees under the bad faith exception to the American Rule. *See* 42 Pa. C.S.A. § 8371

finding that Ironshore did not breach the Ironshore Policy, Conemaugh's claim for nominal damages has been foreclosed as a matter of law.

Given the foregoing analysis, the Court will grant Ironshore's motion for summary judgment as to Conemaugh's claim for breach of contract.

### iii. There is No Genuine Issue of Material Fact Whether Ironshore Breached the Implied Covenant of Good Faith and Fair Dealing

#### A. The Parties' Arguments

Ironshore asserts it is entitled to summary judgment as to Conemaugh's claim for breach of the implied covenant of good faith and fair dealing because there is nothing in the factual record to support a finding of (1) a breach of the implied covenant of good faith and fair dealing or (2) damages under the Ironshore Policy. (ECF No. 176 at 38).

In response, Conemaugh argues that it has demonstrated by clear and convincing evidence that Ironshore breached the duty of good faith and fair dealing and is entitled to judgment in their favor. (ECF No. 221 at 30). Specifically, Conemaugh contends that Ironshore breached the covenant of good faith and fair dealing because (1) Ironshore knowingly misrepresented that it had a right to seek recoupment under the Ironshore Policy, (2) Ironshore averred that Conemaugh was not entitled to coverage under the Ironshore Policy because Ironshore was not made aware of settlement communications, (3) Ironshore failed to elect to participate in the *Harker* Case then later disclaimed coverage, and (4) Conemaugh suffered damages as a result of Ironshore's actions. (ECF No. 221 at 30-31).

#### B. No Reasonable Jury Could Find that Ironshore Breached the Implied Covenant of Good Faith and Fair Dealing

Pennsylvania recognizes claims for breach of the implied duty of good faith. *Benevento v. Life USA Holding, Inc.*, 61 F. Supp. 2d 407, 425 (E.D. Pa. 1999) (applying Pennsylvania law). For a plaintiff to succeed on a claim for breach of the covenant of good faith and fair dealing, the plaintiff must prove by clear and convincing evidence: "(1) the existence of a contract and the content of its essential terms; (2) that [the insurer] breached the implied covenant of good faith and fair dealing; and (3) resultant damages. *Higman v. State Farm Mutual Automobile Insurance Companies*, 2018 WL 5255221 at *8 (W.D. Pa. Oct. 22, 2018) (citing *Charter Oak Ins. Co. v. Maglio Fresh Food*, 45 F. Supp. 3d 461, 467 (E.D. Pa. 2014), *aff'd on other grounds*, 629 F. App'x 239 (3d Cir. 2015)). "In order to fulfill its obligation of good faith and fair dealing, an insurer need only 'accord the interest of the insured the same faithful consideration it gave to its own interest' and evaluate the case honestly, intelligently, and objectively.'" *Maglio Fresh Food*, 45 F. Supp. 3d at 467 (quoting *Keefe v. Prudential Prop. & Cas. Ins. Co.*, 203 F.3d 218, 227 (3d Cir.2000)).

Neither party has disputed the existence of a contract, and Conemaugh has not alleged any damages other than the damages already asserted under its breach of contract claim.[20] (ECF No. 221 at 31). Therefore, the only question left for the Court to resolve is whether Ironshore breached the implied covenant of good faith and fair dealing. *Higman*, 2018 WL 5255221 at *8.

Conemaugh's only remaining argument that Ironshore breached the implied covenant of good faith and fair dealing is that Ironshore "averred in its Amended Complaint that the

---

[20] Conemaugh alleges the same damages as a result of Ironshore's alleged breach of the implied covenant of good faith and fair dealing as it did with Ironshore's alleged breach of contract. (ECF No. 221 at 31). Given the identical nature of the damages claimed under both counts, the Court's analysis found in Section VI.b.ii, *supra*, is applicable here. Further, the Court has already found that (1) Ironshore may seek recoupment under a theory of unjust enrichment, *supra* Section VI.a.iv, and (2) that there is a genuine issue of material fact as to when Ironshore elected to associate in the *Harker Case*, *supra* Section VI.a.ii. The Court need not address these arguments again given the Court's prior findings.

Conemaugh Insureds are not entitled to coverage because they failed to provide Ironshore with settlement communications." (ECF No. 221 at 30) (citing ECF No. 7-1 at ¶ 31). *See also* ECF No. 12 at ¶ 33. Conemaugh argues that Ironshore's averments breached the implied covenant of good faith and fair dealing because "it is clear that the Conemaugh Insured provided Ironshore with all settlement communications they had received and that Ironshore's contention was baseless." (ECF No. 221 at 20).

In its totality, Paragraph 31 of Ironshore's Amended Complaint reads:

31. On March 21, Conemaugh demanded that ProSelect tender its remaining policy limits to settle the matter. In response, ProSelect noted that plaintiffs' counsel had recently made a non-negotiable $15 million demand and that, nevertheless, ProSelect was making an offer of $5 million, which combined with Mcare would total just $6 million.

(ECF No. 12 at ¶ 31).  Further, Paragraph 33 of Ironshore's Amended Complaint reads:

33. By failing to notify Ironshore of the status of settlement negotiations and demands (and lack thereof) prior to and during trial, among other significant events, and by failing to inform Ironshore even that the Harker Action was scheduled for trial, Conemaugh materially breached the cooperation conditions in Section VII(B) of the Ironshore Policy and Section IX(2) of ProSelect Primary Policy, which the Ironshore policy follows.

(ECF No. 12 at ¶ 33).

After reviewing the text of Ironshore's Amended Complaint, the Court finds that no reasonable jury could find that Ironshore breached the implied covenant of good faith and fair dealing because Ironshore's alleged breach was a simple statement of its claim that Conemaugh breached the Election and Cooperation Clause of the Ironshore Policy.  Here, the Court finds that Conemaugh has not produced sufficient evidence to demonstrate a genuine issue of

material fact with respect to Ironshore's alleged breach of the implied covenant of good faith and fair dealing.

For the foregoing reasons, the Court grants Ironshore's motion for summary judgment against Conemaugh. (ECF No. 174).

    c.    **The Court will Grant Coverys' Motion for Summary Judgment Against Conemaugh (ECF No. 171) and Deny Conemaugh's Motion for Summary Judgment Against Coverys (ECF No. 172)**

Coverys contends that its motion for summary judgment against Conemaugh should be granted because (i) Conemaugh cannot establish a breach of contract claim, (ii) Conemaugh cannot establish a bad faith claim against Coverys under Section 8371, and (iii) Conemaugh cannot demonstrate why it is entitled to Contribution from Coverys. (ECF No. 183).

Conemaugh contends that its motion for summary judgment against Coverys should be granted because (i) Conemaugh has clearly established a claim for breach of contract on the part of Coverys and (ii) Conemaugh has clearly established a claim for bad faith under Section 8371. (ECF No. 190).

    i.    **There is No Genuine Issue of Material Fact as to Whether Coverys Breached the Primary Policy**

    A.   **The Parties' Arguments**

Coverys contends that its motion for summary judgment with respect to Conemaugh's breach of contract claim should be granted because Conemaugh has not established by "clear and convincing evidence" that Coverys' conduct was in breach of the insurance policies it had with Conemaugh. (ECF No. 183 at 14-15) (citing *Campbell v. State Farm Mut. Auto. Ins. Co.*, 617 F. Supp. 2d 378, 383 (W.D. Pa. 2008).

Conemaugh argues that its motion for summary judgment with respect to its claim for breach of contract should be granted because Coverys' handling of settlement discussions and refusal to settle the *Harker* Case before trial amounted to contractual bad faith. (ECF No. 190 at 19-32).

### B. No Reasonable Jury Could Find That Coverys Breached the Primary Policy or Breached the Implied Covenant of Good Faith and Fair Dealing

Under Pennsylvania law, "it is well-established that three elements are necessary to plead a cause of action for breach of contract: (1) the existence of a contract, including its essential terms, (2) a breach of the contract; and (3) resultant damages." *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.,* 137 A.3d 1247, 1258 (2016) (citing *J.F. Walker Co., Inc. v. Excalibur Oil Grp., Inc.,* 792 A.2d 1269, 1272 (Pa.Super.2002)). Contract damages must be proved "with reasonable certainty," which means that the damages cannot be "too speculative, vague, or contingent upon some unknown factor." *Ware v. Rodale Press, Inc.,* 322 F.3d 218, 226 (3d Cir. 2003) (applying Pennsylvania law). "In Pennsylvania, a duty of good faith and fair dealing is implicit in an insurance contract." *Simons v. Nationwide Mut. Fire Ins. Co.,* 788 F. Supp. 2d 404, 408 (W.D.Pa. 2011).

Pennsylvania recognizes claims for breach of the implied duty of good faith. *Benevento v. Life USA Holding, Inc.,* 61 F. Supp. 2d 407, 425 (E.D. Pa. 1999) (applying Pennsylvania law). For a plaintiff to succeed on a claim for breach of the covenant of good faith and fair dealing, the plaintiff must prove by clear and convincing evidence: "(1) the existence of a contract and the content of its essential terms; (2) that [the insurer] breached the implied covenant of good faith and fair dealing; and (3) resultant damages. *Higman v. State Farm Mutual Automobile Insurance*

*Companies*, 2018 WL 5255221 at *8 (W.D. Pa. Oct. 22, 2018) (citing *Charter Oak Ins. Co. v. Maglio*

*Fresh Food*, 45 F. Supp. 3d 461, 467 (E.D. Pa. 2014), *aff'd on other grounds*, 629 F. App'x 239 (3d Cir.

2015)). "In order to fulfill its obligation of good faith and fair dealing, an insurer need only

'accord the interest of the insured the same faithful consideration it gave to its own interest' and

evaluate the case honestly, intelligently, and objectively.'" *Maglio Fresh Food*, 45 F. Supp. 3d at

467 (quoting *Keefe v. Prudential Prop. & Cas. Ins. Co.*, 203 F.3d 218, 227 (3d Cir.2000)).

Here, neither party disputes the existence of a contract. (ECF Nos. 191 ¶ 1; 216 at ¶ 1).

Therefore, the Court need only address (1) whether there was a breach of contract, (2) whether

there was a breach of the implied covenant of good faith and fair dealing, and (3) whether there

are any resultant damages.

First, the Court finds no breach of contract on the part of Coverys. Indeed, both

Conemaugh and Coverys concede that Coverys paid the policy limit it was contractually

required to pay under the terms of the Primary Policy. (ECF Nos. 191 at ¶ 109; 216 ¶ 109)

(conceding that Coverys paid its policy limits). Here, the Court finds no reasonable jury could

find that Coverys breached the Primary Policy because Coverys satisfied its obligations to

indemnify Conemaugh under the Primary Policy.

Second, Conemaugh argues that Coverys breached the implied covenant of good faith

and fair dealing because (1) Coverys inadequately appraised the *Harker* Case, (2) Coverys

refused to settle the *Harker* Case prior to trial, (3) Coverys exercised abnormal control over

settlement negotiations, and (4) Coverys prohibited Sosnowski from discussing settlement prior

to the *Harker* trial. (ECF No. 190 at 19-32). In response, Coverys argues that (1) it valued the

*Harker* Case based on an intelligent, objective analysis, (2) both Sosnowski and Guerrini agreed

a few weeks before trial that mediation would not be helpful, (3) Coverys did not exercise abnormal control over settlement negotiation, and (4) Coverys did not prohibit Sosnowski from engaging in settlement discussion prior to trial. (ECF No. 183 at 21-29).

Here, the Court finds that Conemaugh has not met its burden to demonstrate by clear and convincing evidence that Coverys breached the implied covenant of good faith and fair dealing. Conemaugh has produced no evidence that it disagreed with Sosnowski's appraisal of the *Harker* Case. Moreover, Conemaugh has produced no evidence to demonstrate that Sosnowski's determination that settlement and/or mediation would be unproductive before trial was conducted in bad faith. Indeed, Conemaugh has produced no evidence to suggest that it disagreed, in any way, with the settlement and negotiation tactics undertaken by Sosnowski throughout the *Harker* Case. Lastly, the Court finds that the evidence of record clearly demonstrates that Sosnowski was not prohibited from discussing settlement as Sosnowski discussed settlement with the *Harker* Plaintiffs on at least two occasions prior to trial. (*See* ECF Nos. 193 at Exhibit D-18; 260-1 at p. 137:7-138:24). Given the foregoing, the Court finds that Conemaugh has failed to demonstrate by clear and convincing evidence that Coverys breached the implied covenant of good faith and fair dealing.

However, assuming Conemaugh could establish that Coverys breached its contract with Conemaugh, or that Coverys breached the implied covenant of good faith and fair dealing, the Court finds no damages resulted from Coverys' alleged breach because Conemaugh was indemnified for the total amount Coverys owed under the Primary Policy. (ECF Nos. 191 at ¶ 109; 216 ¶ 109) (conceding that Coverys paid its policy limits). Further, with respect to Conemaugh's argument that it is "entitled to recover from Coverys the money Ironshore alleges

Conemaugh owes," (ECF No. 190 at 31), Conemaugh has not sufficiently demonstrated that any breach on the part of Coverys resulted in Conemaugh breaching its obligations and duties under the Ironshore Policy. Conemaugh had a separate contractual relationship with Ironshore to which Coverys was not a party. Conemaugh has not demonstrated how any bad faith action taken by Coverys caused Conemaugh to breach the Ironshore Policy.

For example, Conemaugh is alleged to have breached the Known Claims and Circumstances Clause of the Ironshore Policy. (ECF No. 12). Conemaugh has not demonstrated how Coverys' failure to adequately appraise the *Harker* Case, refusing to settle the *Harker* Case prior to trial, exercising abnormal control over settlement negotiations, and/or prohibiting Sosnowski from discussing settlement prior to the *Harker* trial caused Conemaugh's alleged failure to disclose the *Harker* Case on its policy application to Ironshore. Similarly, with respect to Ironshore's allegation that Conemaugh breached the Election and Cooperation Clause, none of the actions taken by Coverys would have prevented Conemaugh from cooperating with Ironshore as required under the Ironshore Policy. Indeed, even assuming all of Conemaugh's claims of bad faith on the part of Coverys are true, Coverys would not have prevented Conemaugh from communicating the status of the *Harker* Case to Ironshore because Sosnowski kept Conemaugh apprised of the status of the *Harker* Case throughout litigation. (*See* ECF No. 193 at Exhibits D-9, D-15, D-17, D-18, D-19, D-22, D-24). Here, the Court finds that none of the money damages Conemaugh may owe to Ironshore for breaching the Ironshore Policy was a result of Coverys' alleged breach of contract or breach the implied covenant of good faith and fair dealing.

Given the foregoing, the Court finds that no reasonable jury could conclude that Coverys breached the Primary Policy because Coverys satisfied its obligations to indemnify Conemaugh under the Primary Policy. Further, the Court finds that no reasonable jury could find that Coverys breached the implied covenant of good faith and fair dealing because Conemaugh has not met its burden to demonstrate by clear and convincing evidence that Coverys breached the implied covenant of good faith and fair dealing. Therefore, the Court will deny Conemaugh's motion for summary judgment and grant Coverys' motion for summary judgment.

      ii.    **There is No Genuine Issue of Material Fact as to Whether Coverys' Actions Constituted Bad Faith Pursuant to 42 Pa. C.S.A. § 8371**

      A.   **The Parties' Arguments**

Coverys contends that its motion for summary judgment as to Conemaugh's statutory bad faith claim should be granted because the factual record is "devoid of anything to show that Coverys acted in bad faith in the handling of the *Harker* claim." (ECF No. 183 at 18). Specifically, Coverys argues that Conemaugh cannot establish a claim for bad faith under Section 8371 because (1) Coverys had a reasonable basis for its claims-handling processes in valuing the *Harker* Case and (2) Coverys had a reasonable basis for delaying resolution of the *Harker* Case through mediation and/or settlement prior to trial. (*Id.* at 22-25).

Conemaugh argues that its motion for summary judgment with respect to its claims for bad faith on the part of Coverys should be granted because Coverys' failure to timely offer a settlement to the *Harker* Plaintiffs was unreasonable. (ECF No. 190 at 32-37).

     **B. No Reasonable Jury Could Conclude that Coverys' Actions Constituted Bad Faith Pursuant to Section 8371**

"To prevail upon a claim for bad faith under § 8371, a plaintiff must demonstrate by clear and convincing evidence, two elements: '(1) that the insurer had no reasonable basis for denying benefits under the policy and (2) that the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim.'" *Berg v. Nationwide Mutual Insurance Company, Inc.*, 235 A.3d 1223, 1232 (Pa. 2020) (quoting *Rancosky v. Washington Nat'l Ins. Co.*, 170 A.3d 364, 376–77 (Pa. 2017) (adopting the two-part test articulated in *Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680 (Pa. Super. Ct. 1994)). Ultimately, while an insured must prove a statutory bad faith claim by clear and convincing evidence, *Maronda Homes, LLC v. Motorists Mut. Ins. Co.*, 2:20-cv-01526-CCW, 2021 WL 2017337, at *3 (W.D. Pa. May 20, 2021), "'a reasonable basis is all that is required to defeat a claim of bad faith.'" *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 523 (3d Cir. 2012) (quoting *J.C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 367 (3d Cir. 2004)).

Neither party disputes that Coverys indemnified Conemaugh for the full value of the Primary Policy. (ECF Nos. 191 at ¶ 109; 216 ¶ 109) (conceding that Coverys paid its policy limits). However, as the Court has previously found, simply paying an insurance claim is not sufficient to foreclose a claim for bad faith under Section 8371. *See Ironshore Specialty Ins. Co. v. Conemaugh Health Sys.*, 423 F. Supp. 3d 139, 154-155 (W.D. Pa. Nov. 14, 2019), *reconsideration denied* 2020 WL 376994 (W.D. Pa. Jan. 22, 2020). "Payment of [a] claim does not grant immunity from bad faith." 423 F. Supp. 3d at 155 (citing *Barry v. Ohio Cas. Grp.*, No. 3:04-cv-188, 2007 WL 128878, at *11 (W.D. Pa Jan. 12, 2007). "Bad faith can also include poor claims-handling, the insurer's failure to act with diligence to respond to the insured, scattershot investigation, and similar conduct." 423 F. Supp. 3d at 155 (citing *Rancosky*, 170 A.3d at 379 (Wecht, J.,

concurring)).  The Court now turns to Conemaugh's argument that Coverys' refusal to timely

offer a settlement of the *Harker* Case constitutes bad faith within the meaning of Section 8371.

Coverys argues that its failure to mediate and/or settle the *Harker* Case before trial was

reasonable because (1) the *Harker* Plaintiffs made no demand to settle until the jury was

charged, (2) the *Harker* Plaintiffs had no intention of settling the *Harker* Case, and (3) the parties

stipulated that "mediation or other ADR" would not be productive prior to the *Harker* trial.

(ECF No. 183 at 25-27). In response, Conemaugh argues that Coverys had no reasonable basis

for failing to negotiate a settlement prior to the *Harker* trial. (ECF No. 190 at 35).  Specifically,

Conemaugh argues that Coverys had no reasonable basis for failing to negotiate a settlement

with the *Harker* Plaintiffs before trial because Coverys' liability was reasonably clear before trial

was underway. (*Id.*).  Further, Conemaugh argues that Coverys "recklessly disregarded the fact

that [Coverys] had no reasonable basis for failing to negotiate settlement prior to trial." (*Id.*).

Here, the Court finds that Coverys has demonstrated a reasonable basis for refusing to

settle the *Harker* Case prior to trial.  The record evidence is clear that the *Harker* Plaintiffs made

no formal settlement demand until day four of the *Harker* trial.[21]  (ECF No. 200 at Exhibit D-33).

Additionally, from early on in the *Harker* Case, both Sosnowski and Guerrini determined that

mediation would not be productive. (ECF No. 187-2 at Exhibit 38).  That determination was

affirmed again by both Sosnowski and Guerrini on February 9, 2018, when Sosnowski stated

that both he and Guerrini felt that mediation was not a "good use of everyone's time at this

point..." (ECF No. 187-5 at Exhibit 41).  Moreover, Conemaugh has produced no record

---

[21] Before the *Harker* Plaintiffs' made their $15 million demand to settle, Guerrini made a hypothetical demand of $20 million in a conversation with Sosnowski.  However, Guerrini did not have authority from his clients to make an official demand and Sosnowski never communicated Guerrini's hypothetical demand to either Coverys or Conemaugh. (ECF No. 260-1 at Exhibit 72, p. 137:7-139:15).

evidence demonstrating that it disagreed, in any way, with the Sosnowski's mediation strategy or valuation of the *Harker* Case. Indeed, until the Court issued its Rule 50 order on day three of trial, Conemaugh had voiced no concerns with respect to Sosnowski's strategy and made no demand of Coverys to settle the *Harker* Case. (*See Harker*, ECF No. 67; ECF No. 200 at Exhibit D-31). It is only with the hindsight of an unfavorable a $47 million verdict, and pending litigation against it, that Conemaugh now alleges statutory bad faith on the part of Coverys. Conemaugh cannot plausibly argue that Coverys' actions were unreasonable when it has produced no evidence that it disagreed with the strategies, tactics, and valuations of the *Harker* Case at the time Sosnowski was defending it. Here, the Court finds that Conemaugh has failed to meet its burden in demonstrating that Coverys had no reasonable basis for settling the *Harker* Case prior to trial.

With the record before it, the Court finds that the evidence produced does not establish a genuine issue of material fact that Coverys' actions constituted bad faith pursuant to Section 8371. Indeed, the Court finds that no reasonable jury could conclude that Coverys' actions constituted bad faith pursuant to Section 8371. Therefore, the Court will grant Coverys' motion for summary judgment and deny Conemaugh's motion for summary judgment with respect to Conemaugh's Section 8371 bad faith claim.

### iii.    Conemaugh is Not Entitled to Contribution

#### A.    The Parties' Arguments

Coverys contends that its motion for summary judgment as to Conemaugh's contribution claim (Count III) should be granted because Coverys is not responsible for any harm to Ironshore. (ECF No. 183 at 27).

In response, Conemaugh contends that Coverys' motion for summary judgment should be denied because (1) Coverys exercised much more control over the *Harker* Case than expressed in Coverys' guidelines, (2) Coverys controlled the terms and conditions of Sosnowski's representation, (3) Coverys was closely involved in the litigation strategy and kept Conemaugh out of the loop, and (4) Coverys controlled important decisions regarding experts. (ECF No. 225 at 20-22).

### B.   Conemaugh's Claim for Contribution Fails as a Matter of Law

"[T]he Pennsylvania Superior Court declared that 'the right [] of contribution and apportionment of liability among multiple defendants is a matter which is governed exclusively by statute in Pennsylvania.'" *Castle Cheese, Inc. v. MS Produce, Inc.*, 2008 WL 4372856 at *42 (W.D. Pa. Sept. 19, 2008) (quoting *Kemper National P & C Companies v. Smith*, 615 A.2d 372 (Pa.Super.Ct.1992)). "Consequently, a right of contribution under Pennsylvania law can exist only pursuant to the Joint Tort-feasors Act." 2008 WL 4372856 at * 42 (citing *IAP Worldwide Services, Inc. v. UTi U.S., Inc.*, 2006 WL 305443 (E.D. Pa. Feb. 8, 2006)). Since the enactment of the Joint Tort-feasors Act, "courts have consistently held that Pennsylvania does not recognize a right of contribution among defendants in breach of contract cases." *Id.* (citing *Unique Technologies, Inc. v. Micro–Stamping Corp.*, 2003 WL 21652284 at *3 (E.D.Pa. Apr. 15, 2003) (finding that "Pennsylvania law does not recognize a right to contribution in a breach of contract case.")).

Here, the Court finds that Pennsylvania law does not permit Conemaugh to bring a cause of action against Coverys for contribution on a claim for breach of contract. Therefore, Conemaugh's contribution claim fails as a matter of law. Given the foregoing, the Court will

grant Coverys' motion for summary judgment with respect to Conemaugh's claim for contribution.

## VII.   Conclusion

For the forgoing reasons, ProSelect's Motion for Summary Judgment Against Conemaugh (ECF No. 171) is **GRANTED**. Conemaugh's Motion for Summary Judgment Against ProSelect (ECF No. 172) is **DENIED**.  Ironshore's Motion for Partial Summary Judgment Against Conemaugh (ECF No. 173) is **GRANTED**. Conemaugh's Motion for Summary Judgment Against Ironshore (ECF No. 174) is **DENIED**.  An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IRONSHORE SPECIALTY INSURANCE )
COMPANY,                       )
                               )
    Plaintiff and Counterclaim )
    Defendant,                 )
                               )
        v.                     )
                               )
CONEMAUGH HEALTH SYSTEM,       )
INC.,                          )
                               )
    Defendant / Counterclaim   )
    Plaintiff/ Third Party     )
    Plaintiff,                 )
                               )
and JOHN O. CHAN, M.D.,        )
                               )
    Defendant,                 )
                               )
        v.                     )
                               )
PROSELECT INSURANCE COMPANY,   )
                               )
    Third Party Defendant.     )

CIVIL ACTION NO. 3:18-cv-153

JUDGE KIM R. GIBSON

FILED UNDER SEAL

**ORDER**

AND NOW, this ___23rd___ day of March, 2022, upon consideration of the parties' motions

for summary judgment, (ECF Nos. 171, 172, 173, 174), **IT IS HEREBY ORDERED** as follows:

1.  ProSelect's Motion for Summary Judgment Against Conemaugh (ECF No. 171) is

    **GRANTED.**

2.  Conemaugh's Motion for Summary Judgment Against ProSelect (ECF No. 172) is

    **DENIED.**

3.  Ironshore's Motion for Partial Summary Judgment Against Conemaugh (ECF No. 173) is **GRANTED.**

4.  Conemaugh's Motion for Summary Judgment Against Ironshore (ECF No. 174) is **DENIED.**

The Clerk of Court is directed to seal the attached memorandum opinion and order.  **IT IS FURTHER ORDERED** that the parties shall jointly file proposed redactions with the Court within fourteen (14) days of the filing of this Order.

BY THE COURT:

KIM R. GIBSON
UNITED STATES DISTRICT JUDGE